GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:     MÓNICA P. FOLCH
        LI  YU
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-6559/2734
Fax:    (212) 637-2702
Email:  monica.folch@usdoj.gov
        li.yu@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
UNITED STATES OF AMERICA,                                    :
                                                             :
                    Plaintiff,                               :          COMPLAINT
                                                             :
              v.                                             :          19 Civ. ----
                                                             :
AHERN PAINTING CONTRACTORS, INC.,                            :
SPECTRUM PAINTING CORP., and                                 :
TOWER MAINTENANCE CORP.                                      :
                                                             :
                    Defendants.                              :
                                                             :
-------------------------------------------------------------x

        Plaintiff the United States of America, by its attorney, Geoffrey S. Berman, United States

Attorney for the Southern District of New York, alleges as follows:

**INTRODUCTION**

1.       From 2010 until at least 2015, defendants Ahern Painting Contractors, Inc.

("Ahern"), Spectrum Painting Corp. ("Spectrum"), and Tower Maintenance Corp. ("Tower")

(collectively, "defendants") defrauded the United States out of millions of dollars in federal

funding for public works contracts.  Defendants perpetrated this fraud by exploiting a federal

program designed to encourage participation of disadvantaged business entities ("DBEs") in

public construction projects.  Specifically, Ahern, Spectrum, and Tower illegally obtained

millions of dollars by pretending that Tower, a certified DBE, was executing steel painting work

on two federally-funded projects, including managing and supervising the work using its own

staff and resources.  In reality, Spectrum, a non-DBE, directed, managed, and supervised that

work.

2.       The United States Department of Transportation ("US-DOT") provides billions of

dollars every year to build and maintain the nation's highways, bridges, and public transportation

systems.  US-DOT requires that DBEs, including minority- and women-owned businesses, be

given opportunities to participate in the public construction projects that it funds, to encourage

fair competition in the open market.

3.       The Brooklyn Bridge project and the Queens Plaza transit project were two such

public construction projects funded by US-DOT.  The Brooklyn Bridge project involved

rehabilitating the landmark bridge, by repairing the ramps and approaches to improve safety and

reduce traffic congestion, and repainting the entire bridge to prevent steel corrosion.  The Queens

Plaza transit project involved lead abatement and painting of the Astoria and Flushing elevated

transit lines in Queens.

4.      Ahern, a New York-based industrial painting company, was a painting contractor on the Brooklyn Bridge and Queens Plaza projects.  Under US-DOT's DBE program, as a condition of getting hired and paid on these public construction contracts, Ahern was required to subcontract a percentage of the work to DBEs.  And in order to get credit for the DBE subcontracts, the DBEs had to perform a "commercially useful function" on the projects, meaning that the DBEs had to be "responsible for execution of the work of the contract" and "actually [be] performing, managing, and supervising the work involved."  49 C.F.R. § 26.55(c)(1).  DBEs were not allowed to subcontract any of the DBE work to a non-DBE on the Brooklyn Bridge and Queens Plaza contracts.

5.      Instead of searching for legitimate DBEs capable of executing the work on their own, Ahern used Tower's status as a DBE to take credit for millions of dollars of steel painting work on the Brooklyn Bridge and Queens Plaza projects.  But Tower did not perform a commercially useful function on the projects; it only pretended to be responsible for the execution of the DBE work.  In reality, it was Spectrum, a non-DBE, that was in charge of the DBE work.  Spectrum hired workers, directed the work, supervised the work, and provided the equipment, leaving Tower to follow Spectrum's direction.  In exchange, Spectrum agreed to take a substantial portion of the profits from the DBE jobs.

6.      To conceal the fact that Spectrum directed, managed, and supervised the DBE work, Ahern, Spectrum, and Tower engaged in a fraudulent scheme to make it look like Tower alone was executing the DBE work.  On the project work sites, Spectrum employees posed as Tower employees, carrying Tower security identification, wearing Tower vests, and telling others that they were Tower employees.  Ahern, Spectrum, and Tower also repeatedly submitted documentation to the New York City Department of Transportation and the Metropolitan

Transportation Authority, among others, falsely representing Spectrum employees as Tower employees.  And Ahern and Tower repeatedly made or submitted false claims, statements, and records indicating that Tower alone performed and supervised the DBE work on the Brooklyn Bridge and Queens Plaza projects alone, and that Tower did not subcontract any of the DBE work to a non-DBE like Spectrum.

7.     In return for being included on the projects, Spectrum provided kickbacks to Ahern in the form of cash and trips to Atlantic City.  For example, Spectrum's owner paid Ahern's superintendent $10,000 as a "commission."  The owner also arranged for Ahern's vice president to stay and eat for free at an Atlantic City casino where Spectrum's owner had connections.  After one such visit, Spectrum's owner e-mailed Ahern's vice president: "i am happy u had a good time in [Atlantic City] … thanks again for the work u are giving me i will do a good job."

8.     Ahern, Spectrum, and Tower's defrauding of US-DOT's DBE program resulted in defendants receiving millions of dollars to which they were not entitled in connection with the federally-funded Brooklyn Bridge and Queens Plaza projects.

9.     The United States brings this civil fraud action against Ahern, Spectrum, and Tower under the False Claims Act (the "FCA"), 31 U.S.C. § 3729 *et seq*., and common law theories of payment by mistake of fact and unjust enrichment.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345, over the remaining claims pursuant to 28 U.S.C. § 1345, and over all claims pursuant to the Court's general equitable jurisdiction.

11.     This Court may exercise personal jurisdiction over Ahern, Spectrum, and Tower, and venue is proper in this district under 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b), because

defendants conduct business within this district, at least one defendant has an office within this district, a substantial part of the events giving rise to this complaint occurred within this district, and a substantial part of the property that is the subject of this complaint is situated within this district.

## PARTIES

12.     Plaintiff is the United States of America.

13.     Defendant Ahern Painting Contractors, Inc. is a painting and construction contractor and has an office in Woodside, New York.

14.     Defendant Spectrum Painting Corp. is a commercial painting contractor and has an office in Scarsdale, New York.  Spectrum is not a certified DBE.

15.     Defendant Tower Maintenance Corp. is a commercial painting contractor and has an office in Roslyn, New York.  At all times relevant to this complaint, Tower was a DBE.

## BACKGROUND

**A.      US-DOT Mandates DBE Participation In Compliance With DBE Regulations For Federally-Funded Projects**

16.     The United States Department of Transportation provides billions of dollars annually to state and local governments for public construction projects.  The Federal Highway Administration ("FHWA"), an agency within US-DOT, provides funding for the construction and improvement of highways and bridges.  The Federal Transit Administration ("FTA"), another agency within US-DOT, provides funding for the construction and maintenance of local public transportation systems.

17.     In 1999, US-DOT promulgated regulations entitled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs" to provide opportunities for businesses owned by socially and economically

disadvantaged individuals to work on federally-funded public construction projects. *See* 49 C.F.R. Part 26 (the "DBE Regulations"). Specifically, the DBE Regulations seek to "create a level playing field on which DBEs can compete fairly for DOT-assisted contracts"; "ensure that only firms that fully meet [the DBE Regulations'] eligibility standards are permitted to participate as DBEs"; and "promote the use of DBEs in all types of federally-assisted contracts and procurement activities conducted by recipients," among other objectives. *See id*. § 26.1. The DBE Regulations further provide for assistance in the development of DBEs, so they can ultimately compete successfully in the marketplace outside the DBE program. *See, e.g., id*. §§ 26.35-26.39 (providing procedures for DBE business development and mentorship).

18.    The integrity of the US-DOT's DBE program depends upon the establishment and enforcement of systematic procedures to ensure that only bona fide DBEs participate in the program. As a condition of receiving US-DOT funding for public construction projects, funding recipients, such as state and local governments, must establish goals for DBE participation in their federally-funded programs, and enforce federal guidelines concerning DBE participation. *See* 49 C.F.R. §§ 26.37, 26.45.

19.    Once a state or local government sets a goal for DBE participation in a DOT-funded public construction project, the contract may only be awarded to a bidder who makes good faith efforts to meet that DBE goal. 49 C.F.R. § 26.53(a). As part of those required good faith efforts, contractors must submit a list of DBEs that will participate in the contract, a description of the work each DBE will perform, the dollar amount of the participation of each DBE, and a written commitment to use those DBEs. *Id.* § 26.53(b)(2)(i)-(iv). In addition, the proposed DBEs must provide written confirmation of their participation in the contract in the kind and amount of work provided in the contractor's commitment. *Id.* § 26.53(b)(2)(v).

20.    Once disclosed as a DBE participating in the contract, a DBE may not be terminated without the prior written consent of the state or local agency administering the DBE program.  49 C.F.R. § 26.53(f)(1)(i).  "This includes, but is not limited to, instances in which a prime contractor seeks to perform work originally designated for a DBE subcontractor with . . . a non-DBE firm, or with another DBE firm."  *Id.*  Furthermore, a state or local agency will only consent to terminate a DBE if they agree that the contractor "has good cause to terminate the DBE firm."  *Id.* § 26.53(f)(2).

21.    When a DBE participates in a public construction project, payments made to a DBE contractor count toward the DBE goal only if the DBE is performing a "commercially useful function" on the project.  49 C.F.R. § 26.55(c).  A DBE performs a commercially useful function when it is "responsible for execution of the work on the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved."  *Id.* § 26.55(c)(1).  The DBE must also be responsible for "negotiating price, determining quality and quantity, ordering the material [used for the project], and installing (where applicable) and paying for the material itself."  *Id.*

22.    Only the value of the work actually performed by the DBE, with its own work forces, counts toward the DBE goal.  49 C.F.R. § 26.55(a).  Accordingly, "[w]hen a DBE performs as a participant in a joint venture, [the contractor shall] count a portion of the total dollar value of the contract equal to the distinct, clearly defined portion of the work of the contract that the DBE performs with its own forces toward DBE goals."  *Id*. § 26.55(b).

23.    Every US-DOT funded public construction project contract must include an assurance that "[t]he contractor shall carry out applicable requirements of [the DBE Regulations] in the award and administration of DOT-assisted contracts."  49 C.F.R. § 26.13(b).  Every

contract must also provide that "[f]ailure to carry out [the DBE Regulation] requirements is a material breach of this contract, which may result in the termination of this contract or such other remedy as the recipient deems appropriate."  *Id.*

**B.     The DBE Requirements For The Brooklyn Bridge Rehabilitation Project**

24.     Since 2009, the FHWA has provided more than $335 million in funding to the New York City Department of Transportation ("NYC-DOT") for the rehabilitation of the Brooklyn Bridge.  These funds were designated by US-DOT as project X751.06.

25.     As a condition of receiving US-DOT funding for the Brooklyn Bridge Rehabilitation project, NYC-DOT and its contractors and sub-contractors were required to comply with the DBE Regulations.

26.     The NYC-DOT contract for the Brooklyn Bridge Rehabilitation project set forth a goal that 14% of the value of the work performed on the project go to DBEs.  *See* Brooklyn Bridge Rehabilitation (Contract #6), Contract No. BRC 270 C/P (the "Brooklyn Bridge Contract").  The contract further set forth NYC-DOT's objectives under the contract to "Create a level playing field on which [DBEs] can fairly compete for [public construction] contracts"; "Assist in the development of firms that can compete successfully in the construction industry outside the [DBE] programs"; and "Ensure that only firms that fully meet [DBE] eligibility standards are permitted to participate in the [DBE] programs."  And the contract mandated that "[t]he parties to this contract shall take all necessary and reasonable steps in accordance with the laws, rules, and regulations cited in this subsection to promote the objectives outlined above," and specifically directed contractors and sub-contractors to the DBE Regulations "under 49 CFR 26."

27.     Incorporating particular provisions of the DBE Regulations, the Brooklyn Bridge Contract required that a DBE must perform a "commercially useful function" in order for the value of the DBE's work to be counted toward the DBE goal for the project.  Consistent with the

DBE Regulations, the Brooklyn Bridge Contract provided that a DBE performs a commercially useful function when it "is responsible for the execution of a distinct element of work on a contract" and "carries out its responsibilities by actually performing, managing, and supervising the work involved in accordance with normal industry practice."  The Brooklyn Bridge contract further required that "[a]ll work performed by [the DBE] must be controlled and supervised by the [DBE]."

28.     To ensure compliance with the DBE Regulations, the Brooklyn Bridge Contract required contractors to "report payments made to all subcontractors and all [DBEs], in order to measure the goal attainment and to gauge the effect of [DBE] goal(s) on the industry."

29.     The Brooklyn Bridge Contract separately provided that contractors could not unilaterally modify their relationships with DBEs – including to add, remove, or substitute a DBE, to increase the scope of the work for a DBE, or to significantly reduce the dollar value of work for a DBE – without first "provid[ing] written justification with a substantive basis for the change" and obtaining approval from NYC-DOT.

30.     Importantly, the Brooklyn Bridge Contract provided that if a contractor "fail[ed] to comply with the [DBE] requirements," NYC-DOT could cancel, terminate, or suspend the contract.

31.     NYC-DOT retained a third-party firm with expertise in construction management to be stationed on-site to monitor compliance with the DBE Regulations on the Brooklyn Bridge project (the "NYC-DOT Inspectors").

32.     In or around June 2009, Skanska Koch Inc. submitted a bid to NYC-DOT to be the prime contractor for the Brooklyn Bridge project.  In or around that time, defendant Ahern submitted a bid to Skanska to perform bridge painting work as a subcontractor to Skanska.

33.     In or around November 2009, NYC-DOT recommended that the contract for the Brooklyn Bridge Rehabilitation project be awarded to Skanska, "based on the recent efforts and documentation that [Skanska] has done in the Good Faith Efforts to provide opportunities for DBE participation."  In response, FHWA concurred in the award of the Brooklyn Bridge Contract to Skanska.  Thereafter, NYC-DOT awarded the Brooklyn Bridge Contract to Skanska.

34.     In January 2010, defendant Ahern signed a subcontract agreement with Skanska for work on the Brooklyn Bridge project.  Under the terms of the subcontract, Ahern agreed to meet or exceed a DBE goal of approximately 14% of the value of Ahern's subcontract agreement. As one of Ahern's corporate officers admitted under oath, Ahern knew that being able to meet the DBE obligation "was a condition of [Ahern] getting that job" from Skanska.  Separately, Ahern agreed to be bound by the terms of the Brooklyn Bridge Contract, and confirmed that it had "reviewed, examined and thoroughly familiarized itself" with the contract.  In October 2010, Ahern "accepted" an addendum to the subcontract specifically providing that Ahern "must comply with" the DBE Regulations.

35.     In June 2010, Ahern signed a subcontract agreement with defendant Tower, a certified DBE, for a portion of Ahern's work on the Brooklyn Bridge project.  The Ahern-Tower subcontract required that all subcontractors and consultants be approved by Ahern, Skanska, and NYC-DOT.

36.     As part of their reporting obligations, Ahern and Tower submitted a DBE Utilization Worksheet to Skanska and NYC-DOT setting forth the scope of Tower's DBE work on the Brooklyn Bridge project, which consisted primarily of painting and blasting work on the Manhattan side of the Brooklyn Bridge.  The DBE Utilization Worksheet also set forth the amount Tower would be paid for that work.  Finally, the DBE Utilization Worksheet provided

that "[n]o work may be assigned by [Tower] to any second-tier subcontractors," and that Ahern and Tower agreed that a violation of that provision could result in no payment for the related work.

37.     From about August 2010 until about July 2015, also as part of their reporting obligations, Ahern and Tower submitted Contractor Reports of Contract Payments to Skanska and NYC-DOT.  Each report reflected payments due to Tower as well as payments made by Ahern to Tower, for DBE work purportedly executed by Tower.  In each report, Ahern specifically attested that the "work/services" at issue were in fact "performed/supplied by [Tower]."  Tower, in turn, attested in each report that the "work/services" at issue were in fact "performed/supplied and supervised solely by [Tower]."

**C.     The DBE Requirements For The Queens Plaza Project**

38.     Since April 2009, the FTA has provided more than $9 million in US-DOT funding to the Metropolitan Transportation Authority and the New York City Transit Authority (together, "MTA") for an elevated structure at Queens Plaza.  These funds were designated by US-DOT as project X501.69.

39.     As a condition of receiving US-DOT funding for the Queens Plaza project, MTA and its contractors and sub-contractors were required to comply with the DBE Regulations.

40.     Accordingly, the contract for the Queens Plaza project sets forth a DBE participation goal of 17% of the value of the work on the project.  *See* Overcoat Painting of Elevated Structure Abutement – 27th Street, Astoria & Flushing Lines in the Borough of Queens, Contract No. C-34904 (the "Queens Plaza Contract").  The contract expressly provided that the Queens Plaza project was subject to "49 CFR Part 26," and that contractors and sub-contractors were required to "carry out applicable requirements of 49 CFR Part 26."

11

41.     As with the Brooklyn Bridge Contract, the Queens Plaza Contract stated that a DBE must "actually perform[], manag[e], and supervis[e] the work involved"; that the value of non-DBE subcontracted work could not be counted toward the DBE goal; and that a DBE could not be terminated or substituted without the MTA's consent.  In addition, the Queens Plaza Contract required contractors and sub-contractors to submit a schedule of DBE participation as well as Monthly DBE Progress Reports.  The Queens Plaza Contract also provided that "failure … to carry out [the DBE] requirements is a material breach of this contract, which may result in the termination of this contract."

42.     In or around June 2010, Ahern signed a contract with the MTA for work on the Queens Plaza project to provide overcoat painting.  To meet the DBE goal, Ahern again entered into a subcontract agreement with Tower that purported to satisfy the entire DBE goal for the Queens Plaza project.

43.     Further, from about October 2010 until about March 2012, as part of its reporting obligations under the Queens Plaza Contract, Ahern submitted Monthly DBE Progress Reports to MTA, which purported to indicate the amount of DBE work being performed by Tower.  In each of these monthly progress reports, Ahern represented to MTA that Tower did not "subcontract any portion of its work to a non-DBE."

### AHERN, SPECTRUM, AND TOWER ENGAGED IN A FRAUDELENT SCHEME TO VIOLATE DBE REGULATIONS AND COVER UP THOSE VIOLATIONS IN ORDER TO RECEIVE PAYMENTS FOR THE BROOKLYN BRIDGE AND QUEENS PLAZA PROJECTS

44.     Ahern, Spectrum, and Tower conspired to (1) circumvent the DBE Regulations by having Spectrum supervise and manage the DBE work that Tower was required to execute on its own on the Brooklyn Bridge and Queens Plaza projects; (2) conceal Spectrum's substantial role in the projects; and (3) make false statements about Tower's and Spectrum's involvement in the

Brooklyn Bridge and Queens Plaza projects in order to fraudulently obtain payments pursuant to the Brooklyn Bridge and Queens Plaza contracts.

45.     Since at least May 2010, Ahern, Spectrum, and Tower intended for Spectrum to manage and supervise the work assigned to Tower as a DBE on the Brooklyn Bridge and Queens Plaza projects.  In addition to managing and supervising the Tower DBE work, Ahern, Spectrum, and Tower intended for Spectrum to provide financial support and equipment for the projects. And throughout the projects, Spectrum did in fact provide management, supervision, financial resources, and equipment for the DBE work.  Nevertheless, Ahern, Spectrum, and Tower repeatedly made and used false statements and records to cover up Spectrum's substantial involvement in the projects.  As a result, Ahern, Spectrum, and Tower fraudulently obtained millions of dollars in connection with the federally-funded Brooklyn Bridge and Queens Plaza projects.

A.     **Ahern, Spectrum, And Tower Agreed To Use Tower To Get DBE Credit On The Brooklyn Bridge And Queens Plaza Projects And To Use Spectrum To Manage And Supervise The Tower DBE Work On The Projects**

*Brooklyn Bridge Project*

46.     On or about November 23, 2009, NYC-DOT recommended that Skanska be awarded the Brooklyn Bridge Contract based on Skanska's efforts "to provide opportunities for DBE participation."  On or about November 25, 2009, US-DOT concurred in the award of the Brooklyn Bridge contract to Skanska.

47.     Thereafter, on or about January 26, 2010, Skanska hired Ahern to execute approximately $150 million of bridge painting on the Brooklyn Bridge project.  As part of its contract with Skanska, Ahern agreed to subcontract approximately 14% of its bridge painting work to DBEs.

48.      As of late January 2010, Ahern had already committed to hire several DBEs as subcontractors on the Brooklyn Bridge project.  One of those DBEs was Tower, who agreed to a limited scope of work setting up platforms for future painting work on the Brooklyn Bridge.  As of March 2010, Ahern reported DBE participation commitments to Skanska that nearly met Ahern's DBE obligation under its subcontract with Skanska.

49.      However, in or around February 2010, one of the DBEs that Ahern had hired for bridge painting work informed Ahern that it would not be able to execute a substantial portion of the painting work it had previously agreed to.  As a result, Ahern needed to find a DBE to absorb that work in order to meet its DBE obligation.

50.      Tower lacked the expertise and financial resources to be able to take on the additional work Ahern was obligated to subcontract out to DBEs.

51.      Spectrum's most experienced bridge painting manager ("Spectrum's Project Manager") knew Ahern's vice president ("Ahern's VP") and Ahern's superintendent on the Brooklyn Bridge project, having previously worked with them on other large-scale public construction projects.  Spectrum's Project Manager also knew Tower's owner and her husband, a manager at Tower, having worked for Tower previously.  While Spectrum had experienced personnel and sufficient resources, it lacked the industrial painting licenses required to perform the work on its own.

52.      In or around March 2010, Ahern, Spectrum, and Tower agreed that Spectrum would provide the expertise and resources necessary to perform the increased scope of painting and blasting work, and Tower would pay the laborers who would follow Spectrum's direction.  Critically, Ahern, Spectrum, and Tower decided not to disclose Spectrum's role in the projects so that Ahern could count the full amount of the increased scope of work toward its DBE goal.

53.     In or around April 2010, Spectrum's Project Manager and Tower's vice president met with Ahern's superintendent at the Brooklyn Bridge job site to discuss an estimate for the increased scope of painting and blasting work on the Brooklyn Bridge project.  Based on that meeting and on his review of the Brooklyn Bridge plans and relevant documents, Spectrum's Project Manager himself estimated Tower's costs to perform the work and came up with Tower's bid for the expanded scope of DBE work.

54.     In or around May 2010, Ahern, Spectrum, and Tower agreed to expand the scope of DBE work Tower supposedly would perform—and the amount to be paid to Tower—by more than ten times what it had been originally.  By that time, Spectrum's Project Manager had already been approved to work on the Brooklyn Bridge project as a Tower employee.

55.     On or about June 1, 2010, Ahern and Tower signed a subcontract agreement for the expanded scope of work on the Brooklyn Bridge project.  The Ahern-Tower subcontract agreement incorporated the terms of the Brooklyn Bridge Contract, and explicitly required that "[a]ll subcontractors and Consultants must be approved by, Ahern, Koch-Skanska and the NYCDOT."  The agreement made no mention of Spectrum.

*Queens Plaza Project*

56.     Days later, on or about June 4, 2010, Ahern and Tower submitted a proposal to MTA for steel painting work on a different project, the elevated structure in Queens Plaza.  Under the proposal, Ahern was to be the prime contractor and Tower was to be the DBE that would satisfy the entire 17% DBE goal assigned to the Queens Plaza project.  However, at the time Ahern and Tower submitted this proposal to MTA, Ahern, Spectrum, and Tower had already agreed that, as with the Brooklyn Bridge project, Spectrum would provide management, supervision, equipment, and financial resources for the Queens Plaza job and Tower would pay

for the laborers who would follow Spectrum's direction.  Therefore, Ahern and Tower's proposal

for the Queens Plaza project was false insofar as it implied that Tower would be executing 17% of

the contract on its own with its own forces, when in fact, Ahern, Tower, and Spectrum knew that

Spectrum would manage and supervise the entire job as well as provide equipment and financial

resources for the job.

57.     About a week later, on or about June 11, 2010, MTA awarded Ahern the Queens

Plaza project, with a DBE goal of 17%, based on Ahern and Tower's representations in their

proposal that the entire Queen's Plaza DBE goal would be met through a subcontract to Tower.

By misrepresenting Tower's role, and completely omitting Spectrum's role, defendants

fraudulently induced MTA to enter into the Queens Plaza Contract with Ahern and Tower.

**B.      Throughout The Brooklyn Bridge And Queens Plaza Projects, Ahern And Tower
         Relied On Spectrum To Manage And Supervise The Tower DBE Work, And To
         Provide Funds And Equipment For The Work**

58.     As of June 2010, Ahern's VP, project manager, and superintendent, communicated

regularly with Spectrum's Project Manager regarding management of the Tower DBE work on

the projects, including discussions about ordering materials and scheduling work.  Indeed, Tower

and Ahern communicated openly about Spectrum's role on the project, including, for instance, in

an e-mail request for documentation from Ahern "authorizing *spectrum (tower)* for material on

Bklyn bridge ramps."

59.     Later that summer, in August 2010, Ahern and Tower amended their Brooklyn

Bridge subcontract agreement to provide a possible cover story for Spectrum's involvement in the

project.  Ahern and Tower added Spectrum as a supposed "consultant" to Tower on the Brooklyn

Bridge project, describing a minimized role for Spectrum that was far more limited than the

project management and supervision role Spectrum actually had on the project.  The amended

agreement stated: "Ahern Painting Contractors acknowledges [Tower's] August 5th, 2010 letter

naming Spectrum Painting Contractors as a consultant for Lead, Health, Safety and [Q]uality [C]ontrol. (added Aug. 9, 2010)."

60.     In addition, although that same subcontract agreement between Ahern and Tower explicitly provided that "[a]ll subcontractors and consultants must be approved by Ahern, Skanska-Koch, and the NYCDOT," neither Ahern nor Tower sought approval of—or even disclosed—Spectrum's involvement in Tower's DBE work to Skanska or NYC-DOT at any time in 2010.  Indeed, during that time period, Spectrum employees on the Brooklyn Bridge site posed as Tower employees, using Tower security identification, wearing Tower vests, and telling others at the work site that they were Tower employees.

61.     Several months later, in November 2010, Ahern, Spectrum, and Tower again lied about Spectrum's involvement in the Brooklyn Bridge project, when Ahern and Tower signed and submitted to Skanska and NYC-DOT a DBE Utilization Worksheet stating the work Tower was supposed to execute on the Brooklyn Bridge project.  The DBE Utilization Worksheet explicitly provided that "[n]o work may be assigned by [Tower] to a second tier Subcontractor" and that the signatories "agree that violations of the foregoing may result in no payment by the City for the related work."  Yet, at the time Ahern and Tower signed and submitted that DBE Utilization Worksheet to Skanska and NYC-DOT, Spectrum was already managing and supervising the Tower DBE work on the Brooklyn Bridge project, all the while pretending to be Tower.

62.     It was not until March 2011 that Ahern employed the cover story that Spectrum was serving as a "health and safety consultant" to Tower.  In an email to Skanska's project manager, Ahern's VP attached the amended subcontract agreement, and wrote: "the ONLY difference from the original is that [Tower] informed me that Spectrum was a consultant regarding safety and health on this project."  Ahern's fraudulent minimization of Spectrum's role

on the Brooklyn Bridge project worked; Skanska's project manager read the reference to "health and safety" to mean that Spectrum's role was limited to making sure people on site were working safely, which Skanska understood to be a "de minimis" job unlike that of project management.

63.     In reality, however, Spectrum managed and supervised the Tower DBE work on the Brooklyn Bridge and Queens Plaza projects from April 2010 until at least May 2013.

   a.     Spectrum's Project Manager estimated the cost of the Tower DBE work on the Brooklyn Bridge project and put together Tower's bid;

   b.     Spectrum's Project Manager hired individuals to work on the Brooklyn Bridge and Queens Plaza projects, including the general foreman for the Brooklyn Bridge project, two additional foremen for the Brooklyn Bridge project, the safety officer for both projects, and painters for both projects;

   c.     Spectrum's Project Manager located and purchased (on behalf of Spectrum) more than $200,000 of equipment for both projects;

   d.     Spectrum's Project Manager scheduled work and supervised the completion of that work on both projects;

   e.     Spectrum's Project Manager negotiated pricing for materials and ordered materials for both projects; and

   f.     Spectrum's Project Manager managed inspections of the work performed on both projects.

64.     Spectrum's Superintendent also managed and supervised the Brooklyn Bridge and Queens Plaza projects, often working directly with Spectrum's Project Manager.  For instance, Spectrum's Superintendent put together the payroll for non-management employees, ordered materials, scheduled work, and assigned work to painters on the Brooklyn Bridge project.

Spectrum's Superintendent also worked on the Queens Plaza project, managing project schedules, evaluating and selecting vendors, and assigning and supervising work on the project.

65.     Tower employees themselves acknowledged that Spectrum's Project Manager and Superintendent managed and supervised the Brooklyn Bridge and Queens Plaza projects. Tower's "Project Manager" assigned to the Brooklyn Bridge and Queens Plaza projects—who had far less experience in bridge painting than Spectrum's Project Manager or superintendent—admitted in the course of the government's investigation that Spectrum's Project Manager and Superintendent were "in charge of the [Brooklyn Bridge] job."  Similarly, the Tower foreman on the Brooklyn Bridge project—who negotiated his employment conditions with Spectrum's Project Manager and was ultimately hired by Spectrum's Project Manager—acknowledged that Spectrum's Project Manager and Superintendent "ran the show."  Nevertheless, throughout the time Spectrum was managing and supervising the Brooklyn Bridge and Queens Plaza projects, Ahern and Tower repeatedly made and submitted false statements and records indicating that Tower alone was executing its DBE work, including by managing and supervising the DBE work, and that Tower did not subcontract any of the DBE work to a non-DBE like Spectrum.

66.     Ahern was well aware that Spectrum was managing and supervising the work on the Brooklyn Bridge and Queens Plaza projects, even as it represented to Skanska, NYC-DOT, and the MTA that Tower alone was responsible for execution of the DBE work.  Ahern regularly communicated directly with Spectrum's Project Manager and Superintendent throughout the Brooklyn Bridge and Queens Plaza projects regarding the management and supervision of the projects, including scheduling and inspecting the Tower DBE work, ordering materials for the DBE work, and paying for the Tower DBE work, issues well beyond a purported "health and safety" consultancy.  Indeed, Ahern knew that Spectrum had hired a specific individual—different

from Spectrum's Project Manager and Superintendent—to oversee health and safety issues for the Tower DBE work.  That individual was also employed and paid by Spectrum.  Meanwhile, Ahern continued to make false statements and records to NYC-DOT and MTA that Tower was executing the DBE work on its own, with its own resources and workforce, and that it was not subcontracting any of the work to a non-DBE like Spectrum.

67.     Spectrum also incurred significant expenses throughout the Brooklyn Bridge and Queens Plaza projects as a result of the significant amount of work it was performing.  According to Spectrum's record keeping, Spectrum spent more than $1 million of its own funds on project-related expenses on the Brooklyn Bridge and Queens Plaza projects.

68.     Ahern was aware that Spectrum was spending significant funds to cover project-related costs on the Brooklyn Bridge and Queens Plaza projects (something well outside the job description of a "health and safety consultant").

     a.     For instance, in June 2011, Ahern's VP exchanged emails with Spectrum's owner, concerning Spectrum's ability to profit from the Brooklyn Bridge and Queens Plaza projects.  Ahern's VP sent an email to Spectrum's owner asking, "SO….what did you think of the Queens Plaza job[?]" and went on to encourage Spectrum's owner:  "It will go much easier than [the Brooklyn Bridge project] …. It's simple and straight forward… it will be a *money maker*."  Spectrum's owner responded, "*I have not seen any money yet* so hop[e] u are right nice to [hear] from u."

     b.     In July 2011, Ahern's VP exchanged emails with Ahern's project manager on the Brooklyn Bridge project, regarding Spectrum's ability to provide funding for Tower for the Brooklyn Bridge project.  In an email to Ahern's VP, Ahern's project manager tried to dissuade Ahern's VP from entering into an arrangement with Tower that

would allow Ahern to pay some of Tower's debts on the Brooklyn Bridge project. Ahern's project manager wrote, "Are you sure this is a good idea?"  Ahern's VP responded, "What choice do I have? You see options?"  Ahern's project manager then suggested that Ahern "let [Spectrum] fund them, how they do it is not our concern."

      c.      And in July 2013, toward the end of Tower's work on the Brooklyn Bridge project, Ahern's VP described meeting with Spectrum and Tower to discuss settling project-related disputes with Ahern so that Spectrum and Tower could finish the project and stop paying expenses on the project. In Ahern's VP's words, "all [Spectrum and Tower] wanted to do was *stop the bleeding* and get off the project."

      d.      Ahern also knew that Spectrum had provided expensive equipment for the Brooklyn Bridge and Queens Plaza projects.  In fact, Ahern later bought some of that equipment from Spectrum in 2013.

69.      In May and June 2011, Spectrum and Tower memorialized their agreement to have Spectrum manage and supervise the DBE on the Brooklyn Bridge and Queens Plaza projects.  In two separate but nearly identical agreements, Spectrum and Tower agreed that Spectrum would "perform certain consulting services," including "providing project management support"; that Spectrum would furnish equipment to Tower for the projects; and that Tower would pay Spectrum 50% of all profits from the Tower DBE work on the projects.  These consulting agreements made no mention of any supposed "health and safety" consulting role for Spectrum (which was how Ahern previously mischaracterized Spectrum's role to Skanska).  Of course, no one disclosed the existence of these consulting arrangements to Skanska, NYC-DOT, or MTA.

**C.      Spectrum And Tower Paid Kickbacks To Ahern In Exchange For The DBE Work At The Brooklyn Bridge And Queens Plaza Projects**

70.     Ahern's superintendent on the Brooklyn Bridge project, received a $15,000

kickback from Spectrum and Tower in exchange for arranging for Tower and Spectrum to obtain

the Brooklyn Bridge and Queens Plaza contracts.  In an email exchange between Spectrum and

Tower addressing costs associated with the Brooklyn Bridge and Queens Plaza projects, Spectrum

and Tower discussed a "commission payment to [Ahern's superintendent]" to be shared between

Spectrum and Tower.  In a subsequent email, Spectrum's owner instructed his accountant as

follows: "Do not mention [Ahern's superintendent] name in any commission check do we

understand."  A cost report for Spectrum shows a payment to Ahern's superintendent in the

amount of $10,000, and a cost report for Tower shows a payment to Ahern's superintendent in the

amount of $5,000.

71.     Spectrum's owner arranged for Ahern's VP to stay for free at a casino in Atlantic

City.

        a.      In 2010, Ahern's VP sent an email to Spectrum's owner with the subject

"ac hotel": "I appreciate all the help … anything you get is GREAT … and again I have

no problem if you need me to pay!!!"  In fact, Spectrum's owner arranged for Ahern's VP

to eat and stay at the casino for free.  Approximately one day after Ahern's VP returned

from his free trip to Atlantic City, Spectrum's owner sent him an email: "i am happy u had

a good time in ac … thanks again for the work u are giving me i will do a good job."

        b.      The following year, Spectrum's owner again arranged for Ahern's VP to

stay with his friends at an Atlantic City hotel and casino, but the trip was cancelled due to

a hurricane.  However, the casino trip arrangements resumed in 2012, when Ahern's VP

wrote again to Spectrum's owner:  "I wanted to ask if you could help me out with some

rooms in AC again.  I have my fantasy football draft again…hopefully no hurricane this year!  . . . If you can do anything like a few years ago with the one suite type room and another one or two that would be fantastic."  Spectrum's owner obliged and set the trip up for Ahern's VP.

**D.  Ahern, Spectrum, And Tower Fraudulently Concealed Spectrum's Actual Role In The Brooklyn Bridge And Queens Plaza Projects**

72.     Because only work managed and supervised by a DBE can be counted toward DBE goals, Ahern, Spectrum, and Tower concealed Spectrum's actual role in the Brooklyn Bridge and Queens Plaza projects in order to receive payments on the federally-funded projects.

73.     In communications with Skanska that Ahern understood would be forwarded to NYC-DOT, Ahern repeatedly presented Spectrum's Project Manager as a Tower employee even though Ahern, Spectrum, and Tower knew that he was a Spectrum employee.  For instance:

a.     In August 2010, Ahern's project manager sent an email to Skanska attaching a list of "Tower Employees that have been approved [for the Brooklyn Bridge project] and need ids."  The list included Spectrum's Project Manager as "VP" of Tower.

b.     In December 2010, Ahern's project manager sent another email to Skanska identifying Spectrum's Project Manager as Tower "personnel" and Spectrum equipment as Tower "Equipment."

74.     Similarly, a Queens Plaza list of Tower employees included Spectrum's Project Manager as "Director" of Tower.

75.     Ahern, Spectrum, and Tower also repeatedly presented Spectrum's Superintendent as a Tower employee to Skanska, NYC-DOT, and MTA, even though Tower and Spectrum knew, and Ahern knew, or was reckless in not knowing, that this individual was a Spectrum employee. When Spectrum first hired its superintendent in the summer of 2010 to act as the general

superintendent for the Tower DBE work on the Brooklyn Bridge and Queens Plaza projects,
Spectrum's Project Manager told the superintendent that, even though he was being hired by
Spectrum and would be paid by Spectrum, if anyone asked, he should say he worked for Tower.
Spectrum's Project Manager also gave the superintendent a Tower email address and Tower
business cards to use.  As with Spectrum's Project Manager, Ahern represented Spectrum's
Superintendent to be a Tower employee in communications with Skanska to obtain his security
clearance.

76.     In March 2011, after many months of regular interaction with Spectrum's Project
Manager and Superintendent, working with them on issues concerning materials, work schedules,
and payment (among other issues), Ahern's project manager on the Brooklyn Bridge project,
submitted to Skanska a "Commercially Useful Function (CUF) Monitoring Report" concerning
Tower that contained several false statements.  For example, Ahern responded "yes" to the
question, "Does it appear that the Subcontractor firm is: Controlling and supervising their own
work?"; Ahern answered "no" to the question, "Has the Subcontractor subcontracted work to
others?"; and Ahern answered "yes" to the question, "Does it appear that the Subcontractor firm
is: Using/renting own equipment and tools?"  Ahern's project manager knew these responses
were false when he submitted them.

77.     And in interviews conducted by NYC-DOT Inspectors monitoring compliance
with the DBE Regulations in August 2012, Spectrum's Project Manager and Superintendent
falsely stated that they were employed by Tower.  Indeed, Spectrum's Project Manager told
NYC-DOT that he was an "estimator" who usually worked at Tower's main office, and said that
he seldom went to the Brooklyn Bridge job site.  Both of these statements were false.

78.     In a March 2013 meeting to discuss the Tower DBE work on the Brooklyn Bridge project attended by Ahern, Tower, Skanska, NYC-DOT representatives, and others, Spectrum's Project Manager again represented himself to be a Tower employee.

79.     Throughout the Brooklyn Bridge project, Spectrum's Project Manager, Superintendent, and Safety Officer—all Spectrum employees working on the Brooklyn Bridge project—had security identification cards falsely identifying them as Tower employees.  They also wore Tower vests on the Brooklyn Bridge work site.

80.     Defendants continued to conceal the full extent of Spectrum's role even after Tower and Spectrum ended their involvement with the Brooklyn Bridge and the Queens Plaza projects.  For example, when investigators from US-DOT met with a Tower executive in November 2013 regarding DBE compliance and Tower's relationship with Spectrum and Ahern, the Tower executive did not disclose Spectrum's involvement with the Queens Plaza project.

**E.     Ahern, Spectrum, And Tower Made Or Submitted False Statements And Records Regarding Tower's Role In The DBE Work In Order To Receive Payment On The Brooklyn Bridge And Queens Plaza Contracts**

81.     On or about December 1, 2010, Ahern and Tower signed and submitted to Skanska and NYCDOT a DBE Utilization Worksheet falsely representing that Tower alone would execute a specific amount of DBE work on the Brooklyn Bridge project, and that Tower would not assign any of that DBE work to a second tier subcontractor.  In the DBE Utilization Worksheet, Ahern and Tower also acknowledged that assigning work to a subcontractor could result in no payment for the DBE work.  At that time, Ahern, Spectrum and Tower knew that Spectrum was managing and supervising the Tower DBE work on the Brooklyn Bridge project.

82.     From at least August 2010 until about July 2015, Ahern and Tower signed and submitted to NYCDOT approximately 23 Contractor Reports Of Contract Payments showing all payments due to Tower and all payments made to Tower as of the date of submission.  Each

Contractor Report of Contract Payment falsely represented that Tower "solely" "performed" and "supervised" the Tower DBE work on the Brooklyn Bridge project for which Tower received payment.  All that time Ahern, Spectrum, and Tower knew that Spectrum was managing and supervising the DBE work and that Tower was merely paying union labor to follow Spectrum's directions.

83.     From at least 2010 until 2015, NYC-DOT relied on the DBE Utilization Worksheet and the Contractor Reports Of Contract Payments to determine the value of Tower's contribution to the project, whether Ahern and Skanska were meeting the Brooklyn Bridge DBE goal, and whether Ahern and Tower were complying with the DBE Regulations and the Brooklyn Bridge Contract.  Through the DBE Utilization Worksheet and the Contractor Reports Of Contract Payments, Ahern, Spectrum, and Tower caused Skanska to represent to NYC-DOT that Tower had not subcontracted out any DBE work, and that Tower had been paid in an amount equivalent to the value of Tower's work using only its own forces.  Ahern also submitted, and Spectrum and Tower caused Ahern to submit, requests for partial payment based on Tower invoices purporting to reflect the value of Tower's work using only its own forces.

84.     Ahern and Tower were required to submit the Contractor Report Of Contract Payments as part of their applications for payment, and Ahern, Spectrum, and Tower received federal funds as a result of making or causing to be made false statements in the Contractor Reports Of Contract Payments.

85.     Ahern signed and submitted to MTA approximately 18 Monthly DBE Progress Reports from about October 2010 until about March 2012.  Each report reflected the total value of Tower's DBE subcontract, as well as the total amount due to Tower and the amount paid to Tower as of the date of submission.  Each Monthly DBE Progress Report submitted to MTA by

Ahern and Tower falsely represented that Tower did not "subcontract any portion of its work to a non-DBE" for the Queens Plaza project. Again, all that time, defendants knew that Spectrum was managing and supervising the DBE work on the Queens Plaza project and that Tower was merely paying union labor to follow Spectrum's lead.

86.     From at least 2010 until 2012, MTA relied on the Monthly DBE Progress Reports to determine the value of Tower's contribution to the project, whether Ahern was meeting the Queens Plaza DBE goal, and whether Ahern and Tower were complying with the DBE Regulations and the Queens Plaza Contract. Through the Monthly DBE Progress Reports, Ahern represented, and Spectrum and Tower caused Ahern to represent, to MTA that Tower had not subcontracted out any DBE work to a non-DBE, and that Tower had been paid in an amount equivalent to the value of Tower's work using only its own forces. Ahern also submitted, and Spectrum and Tower caused Ahern to submit, requests for partial payment based on Tower invoices purporting to reflect the value of Tower's work using only its own forces.

87.     Ahern and Tower were required to submit Monthly DBE Progress Reports as part of their applications for payment, and Ahern, Spectrum, and Tower received federal funds as a result of making or causing to be made false statements in the Monthly DBE Progress Reports.

88.     In addition, Ahern, Spectrum, and Tower falsely represented that Spectrum's Project Manager, Superintendent, and Safety Officer were Tower employees in submissions to Skanska and NYC-DOT in order to obtain security clearances for those individuals to work on the Brooklyn Bridge project. Ahern, Spectrum, and Tower also falsely represented that Spectrum's Project Manager, Superintendent, and Safety Officer were Tower employees in submissions to MTA in connection with the Queens Plaza project. And when interviewed by NYC-DOT

Inspectors regarding their work on the Brooklyn Bridge project, Spectrum employees falsely represented that they were employed by Tower.

89.     In May 2017, the United States and Ahern entered into a tolling agreement, pursuant to which the parties agreed that any statute of limitations applicable to the claims at issue here would be tolled from and including May 18, 2017, through and including July 31, 2017. That tolling period was subsequently extended through and including November 30, 2018. Accordingly, the United States is entitled to pursue claims related to conduct dating back to May 18, 2011.  *See* 31 U.S.C. § 3731(b).

90.     No official of the United States charged with responsibility to act in the circumstances knew or should have known the facts material to the FCA claims related to the Queens Plaza Project prior to February 2017.  Accordingly, the United States is entitled to pursue false claims Ahern, Spectrum, or Tower made or caused to be made from and including March 6, 2009.  *See* 31 U.S.C. § 3731(b).

**F.     Defendants' Fraudulent Conduct Was Material To The United States' Payments For The Brooklyn Bridge And Queens Plaza Projects**

91.     Compliance with the DBE Regulations was material to the payments made by the United States for the Brooklyn Bridge and Queens Plaza projects.  Compliance with the DBE Regulations' requirements and DBE-related contractual requirements—including those concerning the DBE's performance of a commercially useful function by executing the DBE work with its own forces, and supervising and managing its own work—were conditions of payment for work under the Brooklyn Bridge and Queens Plaza contracts.  Ahern, Tower, and Spectrum received federal funds to which they were not entitled as a result of presenting or causing to be presented false claims and making or causing to be made false statements and

records concerning Tower's and Spectrum's actual roles on the Brooklyn Bridge and Queens Plaza projects.

92.     Further, to ensure compliance with the DBE Regulations on projects financed by US-DOT, the United States has actively enforced the regulations through administrative and judicial actions.

93.     Specifically, the United States, through US-DOT and its components, has repeatedly suspended or debarred contractors and their owners, *i.e.*, excluding these entities and individuals from being eligible to participate in federally-funded projects permanently or for a period of time, based on their involvement in schemes to defraud US-DOT's DBE program.

94.     Further, the United States has actively pursued the recovery of contract payments for US-DOT funded projects that were subject to DBE fraud through civil and criminal actions, including in a number of actions in this District.

95.     Indeed, defendant Ahern itself was the subject of previous administrative and civil enforcement efforts by the United States for participating in DBE fraud.  In 2016, Ahern agreed to pay $656,000 to the United States to settle claims that Ahern violated the DBE Regulations by using marked-up invoices to pass money through a purported DBE to a non-DBE.  FHWA, in turn, suspended Ahern and subsequently placed it under a monitoring agreement for its violation of the DBE Regulations.

## CLAIM FOR RELIEF

### COUNT ONE: FALSE CLAIMS ACT
### Violations of the False Claims Act: Presentation of False Claims

96.     The United States repeats and realleges the allegations in paragraphs 1 through 95.

97.     The United States asserts claims against defendants under Section 3729(a)(1)(A) of the False Claims Act.

98.     In furtherance of their scheme to violate the DBE Regulations and to conceal these violations by hiding Spectrum's actual role from NYC-DOT, MTA, and US-DOT, defendants knowingly presented, or caused to be presented, to NYC-DOT and MTA, as recipients of federal funds that were spent on the United States' behalf and to advance the United States' interests, false or fraudulent claims for payment of federal funds, including, *inter alia*, a DBE Utilization Worksheet and numerous Contractor Reports of Contract Payment for the Brooklyn Bridge project and numerous Monthly DBE Progress Reports for the Queens Plaza Contract.

99.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

100.     Accordingly, the United States is entitled to treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented and an award of costs pursuant to 31 U.S.C. § 3729(a)

### COUNT TWO: FALSE CLAIMS ACT
### Violations of the False Claims Act: Making or Using a False Record or Statement

101.     The United States repeats and realleges the allegations in paragraphs 1 through 100.

102.     The United States asserts claims against defendants under Section 3729(a)(1)(B) of the False Claims Act.

103.     In furtherance of their scheme to violate the DBE Regulations and to conceal these violations by hiding Spectrum's actual role from NYC-DOT, MTA, and US-DOT, defendants knowingly made or used, or caused to be made or used, false records or statements, including, *inter alia*, misrepresentations as to the scope of Tower's work in DBE Utilization Worksheets and in the Contractor Reports of Contract Payments for the Brooklyn Bridge project, and in the

Monthly DBE Progress Reports for the Queens Plaza project, that were material to getting false or fraudulent claims paid by NYC-DOT and MTA, as recipients of federal funds that were spent on the United States' behalf and to advance the United States' interests.

104.    By reason of these false statements or records, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil penalty as required by law for each violation.

## COUNT THREE: FALSE CLAIMS ACT
### Violations of the False Claims Act: Conspiring to Violate the FCA

105.    The United States repeats and realleges the allegations in paragraphs 1 through 104.

106.    The United States asserts claims against defendants under Section 3729(a)(1)(C) of the False Claims Act.

107.    Defendants conspired to violate the DBE Regulations and to conceal these violations from NYC-DOT, MTA, and US-DOT.  In furtherance of this conspiracy, Ahern and Tower repeatedly misrepresented to NYC-DOT and MTA the scope of Tower's work for the Brooklyn Bridge project and for the Queens Plaza project.  In addition, Ahern, Tower and Spectrum each took steps to hide Spectrum's actual role from NYC-DOT and MTA.

108.    Defendants further conspired to make or use, or cause to be made or used, false records or statements, including, *inter alia*, misrepresentations as to the scope of Tower's work in DBE Utilization Worksheets and in the Contractor Reports of Contract Payments for the Brooklyn Bridge project, and in the Monthly DBE Progress Reports for the Queens Plaza project, that were material to getting false or fraudulent claims paid by NYC-DOT and MTA, as recipients of federal funds that were spent on the United States' behalf and to advance the United States' interests.

109.     In violation of 31 U.S.C. § 3729(a)(1)(C), defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).  This conspiracy caused the United States to sustain damages in a substantial amount to be determined at trial.  The United States, therefore, is entitled to recover treble damages plus a civil penalty as required by law for each violation.

## COUNT FOUR: UNJUST ENRICHMENT

110.     The United States repeats and realleges the allegations in paragraphs 1 through 109.

111.     By reason of the payments to Ahern, Tower, and Spectrum, defendants were unjustly enriched.  The circumstances of defendants' receipt of these payments are such that, in equity and good conscience, defendants should not retain these payments, the amount of which is to be determined at trial.

## COUNT FIVE: PAYMENT UNDER MISTAKE OF FACT

112.     The United States repeats and realleges the allegations in paragraphs 1 through 111.

113.     The United States seeks relief against defendants to recover monies paid under mistake of fact.

114.     The United States made payments to fund the Brooklyn Bridge project and the Queens Plaza project based on a mistaken and erroneous understanding of a material fact—the fact being that defendant were complying with DBE Regulations."

115.     The United States is entitled to receive payments it made based on its mistake belief that defendants were complying with DBE Regulations.

116.    By reason of the foregoing, the United States was damaged in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that judgment be entered in its favor and against defendants as follows:

      (i)    On Counts 1, 2, and 3 (False Claims Act) against Ahern, Spectrum, and Tower, for treble the United States' damages, in an amount to be determined at trial, plus civil penalties as allowed by law;

      (ii)    On Counts 4 and 5, against Ahern, Spectrum, and Tower, for relief in an amount to be determined at trial; and

      (iii)    Order such further relief as the Court may deem just and proper.

Dated: March 6, 2019
      New York, New York

           GEOFFREY S. BERMAN
           United States Attorney
           *Attorney for the United States*

           MONICA P. FOLCH
           LI  YU
           Assistant United States Attorneys
           86 Chambers Street, 3rd Floor
           New York, New York 10007
           Tel.:    (212) 637-2800
           Fax:    (212) 637-2702
           Email:  monica.folch@usdoj.gov
                   li.yu@usdoj.gov