UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                   Plaintiff,

          -against-

SPECTRUM PAINTING CORP., and TOWER
MAINTENANCE CORP.,

                   Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/2020____
```

19 Civ. 2096 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the United States of America (the "Government") alleges that Ahern Painting Contractors, Inc. ("Ahern"), Tower Maintenance Corp. ("Tower"), and Spectrum Painting Corp. ("Spectrum"), while working on renovations of the Brooklyn Bridge and Queens Plaza, engaged in a scheme to circumvent federal rules designed to encourage the participation of historically disadvantaged businesses in federally funded construction projects. Compl. ¶¶ 1–7, 12–15, ECF No. 35. As a result, the Government claims, millions of dollars of federal funding were disbursed under false pretenses. *Id.* ¶ 1. The Government seeks to recover under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, as well as New York common law. *Id.* ¶ 9.

Now before the Court are motions to dismiss under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure filed by Tower and Spectrum. ECF Nos. 46, 51, 54. In addition, Ahern moves for an order removing it from the case caption as a result of Ahern's settlement with the Government. ECF No. 49. For the reasons that follow, Tower's and Spectrum's motions are GRANTED in part and DENIED in part. Ahern's motion is GRANTED.

# BACKGROUND

## I.     Regulatory Background

The United States Department of Transportation (the "USDOT") provides states and localities with funds for public construction projects.  Compl. ¶ 16. That funding is conditioned on, among other things, those agencies' compliance with federal regulations designed to increase the participation of disadvantaged business enterprises ("DBEs") in public works projects.  *See* 49 C.F.R. Part 26 (the "DBE Regulations").  A DBE is a small business in which a majority ownership stake is held by individuals "who are both socially and economically disadvantaged," meaning that they are "citizen[s] (or lawfully admitted permanent resident[s]) of the United States" and have "been subjected to racial or ethnic prejudice or cultural bias within American society because of [their] identity as . . . members of groups and without regard to [their] individual qualities."  49 C.F.R. § 26.5.

USDOT regulations require recipients of funds to, among other things, (1) set an overall goal for DBE participation in their USDOT-assisted contracts, 49 C.F.R. § 26.45; (2) "meet the maximum feasible portion of [their] overall goal by using race-neutral means of facilitating race-neutral DBE participation," *id.* § 26.51; and (3) "implement appropriate mechanisms to ensure compliance with . . . requirements by all program participants" and "a monitoring and enforcement mechanism to ensure that work committed to DBEs . . . is actually performed by the DBEs to which the work was committed," *id.* § 26.37.  When a participant seeks to meet its DBE goals by hiring DBEs as contractors, it may "[c]ount expenditures to a DBE contractor toward DBE goals only if the DBE is performing a commercially useful function on that contract."  *Id.* § 26.55(c).  The regulations provide detailed descriptions of what constitutes a commercially useful function, including, as relevant here:

(1) A DBE performs a commercially useful function when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved. To perform a commercially useful function, the DBE must also be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself. To determine whether a DBE is performing a commercially useful function, you must evaluate the amount of work subcontracted, industry practices, whether the amount the firm is to be paid under the contract is commensurate with the work it is actually performing and the DBE credit claimed for its performance of the work, and other relevant factors.

(2) A DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation. In determining whether a DBE is such an extra participant, you must examine similar transactions, particularly those in which DBEs do not participate.

*Id.* § 26.55(c).

II.    Factual Allegations

The following facts are drawn from the Government's amended complaint, and accepted as true for the purposes of this motion. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) ("On a motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim, the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive.").

A.  The Projects

Since 2009, the USDOT has provided more than $335 million to the New York City Department of Transportation (the "NYCDOT") for the rehabilitation of the Brooklyn Bridge, and more than $9 million to the Metropolitan Transportation Authority and the New York City Transit Authority (together, the "MTA") for lead abatement and painting of elevated transit lines at Queens Plaza.  Compl. ¶¶ 3, 24, 38.  On both projects, the agencies and their subcontractors

were required to comply with the DBE Regulations. *Id.* ¶¶ 25, 39. The regulations were incorporated into the projects' contracts. *Id.* ¶¶ 26, 40.

The Brooklyn Bridge contract set forth a goal that 14% of the dollar value of the work performed on the project go to DBEs. *Id.* ¶ 26. It required that DBEs perform a "commercially useful function" in order for the value of the DBE's work to be counted toward the DBE goal for the project, mandated that contractors "report payments made to all subcontractors and all [DBEs], in order to measure the goal attainment and to gauge the effect of [DBE] goal(s) on the industry," and provided that contractors could not unilaterally modify their relationships with DBEs—including to add, remove, or substitute a DBE, to increase the scope of the work for a DBE, or to significantly reduce the dollar value of work for a DBE—without first "provid[ing] written justification with a substantive basis for the change" and obtaining approval from the NYCDOT. *Id.* ¶¶ 27–29. The contract stated that if a contractor "fail[ed] to comply with the [DBE] requirements," the NYCDOT could cancel, terminate, or suspend the contract. *Id.* ¶ 30

The contract for the Queens Plaza project set forth a DBE participation goal of 17% of the dollar value of the work on the project. *Id.* ¶ 40. The contract expressly provided that the Queens Plaza project was subject to "49 CFR Part 26," and that contractors and sub-contractors were required to "carry out applicable requirements of 49 CFR Part 26." *Id.* As with the Brooklyn Bridge contract, the Queens Plaza contract stated that a DBE must "actually perform[], manag[e], and supervis[e] the work involved"; that the value of non-DBE subcontracted work could not be counted toward the DBE goal; and that a DBE could not be terminated or substituted without the MTA's consent. *Id.* ¶ 41. In addition, the contract required contractors and sub-contractors to submit a schedule of DBE participation as well as monthly DBE progress reports. It provided that "failure . . . to carry out [the DBE] requirements is a material breach of

this contract, which may result in the termination of this contract." *Id.*

In 2009, the NYCDOT awarded the Brooklyn Bridge contract to Skanska Koch, Inc. ("Skanska"). *Id.* ¶ 33. In January 2010, Skanska signed a subcontract with Ahern to perform approximately $140 million in bridge-painting work. *Id.* ¶¶ 34, 28. Under the terms of the subcontract, Ahern agreed to meet or exceed a DBE goal of approximately 14% of the dollar value of Ahern's subcontract agreement. *Id.* ¶ 34. Ahern, in turn, had a subcontract with Tower to set up platforms for the painting work. *Id.* ¶ 49. Tower is a DBE. *Id.* ¶ 15. In June 2010, the two companies expanded on that contract, agreeing that Tower would also perform steel painting work. *Id.* ¶¶ 50, 60. That subcontract incorporated the terms of the Brooklyn Bridge contract, and explicitly required that "[a]ll subcontractors and [c]onsultants must be approved by, Ahern, [Skanska] and the NYCDOT." *Id.* ¶ 60.

In June 2010, Ahern bid on the Queens Plaza project, again offering steel painting services. *Id.* ¶¶ 61–62. The bid stated that Ahern would meet the 17% DBE goal by subcontracting with Tower. *Id.* ¶ 61. The MTA awarded Ahern the contract. *Id.* ¶ 62.

B. The Alleged Scheme

Tower did not have the expertise or financial resources to perform the steel painting work that it had agreed to. *Id.* ¶ 51. Spectrum had the experience and resources, but lacked the required industrial painting licenses, and was not a DBE. *Id.* ¶¶ 13, 52–54. So, the two companies, and Ahern, made a deal. They agreed that Spectrum would provide the expertise and resources necessary to perform the work, and Tower would pay the laborers who would follow Spectrum's direction. *Id.* ¶ 59. In two agreements, one for the Brooklyn Bridge work and one for the Queens Plaza work, Spectrum and Tower agreed that Spectrum would "provid[e] project management support"; that Spectrum would furnish equipment; and that Tower would pay

Spectrum 50% of all profits from the DBE work on the projects.  *Id.* ¶ 75.  Ahern, Tower, and

Spectrum agreed that Spectrum's role in the project would be disguised.  *Id.*  In August 2010, the

Brooklyn Bridge subcontract between Ahern and Tower was amended to include Spectrum as a

"as a consultant for [l]ead, [h]ealth, [s]afety and [q]uality [c]ontrol."  *Id.* ¶ 64.

Spectrum's actual role on both the Brooklyn Bridge and Queens Plaza projects, however,

extended much further than that of a consultant, including the following:

    a.  Spectrum's Project Manager estimated the cost of the Tower DBE work on the Brooklyn
       Bridge project and put together Tower's bid;

    b.  Spectrum's Project Manager hired individuals to work on the Brooklyn Bridge and
       Queens Plaza projects, including the general foreman for the Brooklyn Bridge project,
       two additional foremen for the Brooklyn Bridge project, the safety officer for both
       projects, and painters for both projects;

    c.  Spectrum's Project Manager located and purchased (on behalf of Spectrum) more than
       $200,000 of equipment for both projects;

    d.  Spectrum's Project Manager scheduled work and supervised the completion of that work
       on both projects;

    e.  Spectrum's Project Manager negotiated pricing for materials and ordered materials for
       both projects; and

    f.  Spectrum's Project Manager managed inspections of the work performed on both
       projects.

*Id.* ¶ 68.

Spectrum's superintendent also managed and supervised the Brooklyn Bridge and

Queens Plaza projects, often working directly with Spectrum's project manager.  *Id.* ¶ 69.

Spectrum's superintendent put together the payroll for non-management employees, ordered

materials, scheduled work, and assigned work to painters on the Brooklyn Bridge project.  *Id.*

Spectrum's superintendent also worked on the Queens Plaza project, managing project

schedules, evaluating and selecting vendors, and assigning and supervising work on the project.

*Id.*

When communicating with Skansa about the Brooklyn Bridge project, Ahern repeatedly

presented Spectrum's project manager and superintendent as Tower employees, even though

Ahern, Spectrum, and Tower knew that they were Spectrum employees. *Id.* ¶ 80, 82, 86.  In interviews conducted by NYCDOT inspectors monitoring compliance with the DBE Regulations in August 2012, Spectrum's project manager and superintendent stated that they were employed by Tower. *Id.* ¶ 85.  Spectrum's project manager told the inspectors that he was an "estimator" who usually worked at Tower's main office, and said that he seldom went to the Brooklyn Bridge job site. *Id.*  Throughout the Brooklyn Bridge project, Spectrum's project manager, superintendent, and safety officer had security identification cards identifying them as Tower employees, and wore Tower vests. *Id.* ¶¶ 87–88.

Similarly, a list of Tower employees created for the Queens Plaza project included Spectrum's project manager as "Director" of Tower, and several contractor access forms submitted to the MTA listed Spectrum's project manager and Spectrum's superintendent as Tower superintendents. *Id.* ¶ 81.

C.  The Brooklyn Bridge and Queens Plaza Claims for Payment

In December 2010, as part of their obligations on the Brooklyn Bridge project, Ahern and Tower submitted a "DBE [u]tilization [w]orksheet" to Skanska and NYCDOT setting forth the scope of Tower's DBE work on the Brooklyn Bridge project and the amount Tower would be paid for that work, and stating that Tower would not further subcontract the work. *Id.* ¶¶ 36, 90. From August 2010 until July 2015, Ahern and Tower were required to submit to Skanska and NYCDOT approximately 36 "[c]ontractor [r]eports [o]f [c]ontract [p]ayments" ("Contractor Reports"), showing all payments due to Tower and all payments made to Tower on the Brooklyn Bridge project as of the date of submission. *Id.* ¶ 91, 93.  Each of those Contractor Reports represented that Tower solely performed and supervised the DBE work on the Brooklyn Bridge project for which Tower was paid. *Id.*  Spectrum was aware of the Contractor Reports, and the

fact that they were submitted to NYCDOT.  *Id.*  NYCDOT relied on the DBE utilization

worksheet and the Contractor Reports to determine the value of Tower's contribution to the

Brooklyn Bridge project, whether Ahern and Skanska were meeting the Brooklyn Bridge DBE

goal, and whether Ahern and Tower were complying with the DBE Regulations and the

Brooklyn Bridge contract.  *Id.* ¶ 92.

From September 2010 until July 2013, and in January 2014, June 2014, and July 2015,

Skanska submitted to the NYCDOT approximately 36 claims for payment, requesting funding

for, among other things, work purportedly supervised and performed solely by Tower on the

Brooklyn Bridge project (the "Brooklyn Bridge Claims").  *Id.* ¶ 94.  In connection with those

monthly claims, Skanska also submitted to the NYCDOT a document titled "Documents Needed

In Processing Sponsors Request For Payment" indicating that Skanska was required to submit

"documentation of effort to meet [DBE] goals," and a document titled "Unit Item Payment

Checklist" indicating that Skanska had submitted all required Contractor Reports.  *Id.*  Skanska

also submitted the applicable Contractor Reports for Tower's purported DBE work, and other

documents reflecting Tower's purported participation on the Brooklyn Bridge Project.  *Id.*

Spectrum and Tower knew that Skanska had submitted these documents.  *Id.*

On the Queens Plaza project, Ahern was required to sign and submit to the MTA

approximately 20 monthly DBE progress reports from about February 2011 until about April

2012.  *Id.* ¶¶ 96, 98.  Each report reflected the total value of Tower's DBE subcontract, as well as

the total amount due to Tower and the amount paid to Tower as of the date of submission, and

represented that Tower did not subcontract any portion of its work to a non-DBE.  *Id.* ¶ 96.  The

MTA relied on the monthly DBE progress reports to determine the value of Tower's contribution

to the Queens Plaza project, whether Ahern was meeting the Queens Plaza DBE goal, and

whether Ahern and Tower were complying with the DBE Regulations and the Queens Plaza Contract.  *Id.* ¶ 97.

In August 2011, October 2011, December 2011, January 2012, March 2012, and May 2012, Ahern submitted to the MTA six invoices signed by Ahern representatives, which requested payment for work purportedly supervised and performed solely by Tower on the Queens Plaza project (the "Queens Plaza Claims").  *Id.* ¶ 99.  In connection with the claims for payment, Ahern also submitted the monthly DBE progress reports applicable to the claim for payment being made, and other documents reflecting Tower's purported participation on the Queens Plaza project, including Tower payroll reports.  *Id.*  Spectrum and Tower knew that Ahern submitted those claims.  *Id.*

## DISCUSSION

I.     Settlement

In October 2019, Ahern and the Government reached a settlement, and the Court dismissed Ahern from the case.  ECF No. 41.  Ahern now moves to remove its name from the caption, arguing that if its name is left in the caption, "Ahern would continue to be associated with this case that could remain pending for an extended period," causing potential harm to its reputation.  ECF No. 49.  The Government does not oppose the motion.  *Id.*

Ahern's motion to amend is GRANTED.  The caption will be amended to exclude Ahern.

II.    Motion to Dismiss Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court may consider only the complaint, documents attached to the complaint, matters of which a court

can take judicial notice, or documents that Plaintiff knew about and relied upon.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  The Court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)

III.    False Claims Act

The Government alleges that Tower and Spectrum violated the FCA by (1) presenting or causing to be presented false claims for payment, Compl. ¶¶ 111–115; (2) making, using, or causing to be made or used false records or statements, *id.* ¶¶ 116–119; and (3) conspiring to violate the FCA's substantive provisions, *id.* ¶¶ 120–124.

A.  Legal Standards

The FCA imposes liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).  It also prohibits conspiring to violate the FCA's substantive provisions.  *Id.* § 3729(a)(1)(C).

"To state a claim under [§ 3729(a)(1)(A)], the plaintiff must show 'the defendants (1) made a claim, (2) to the United States Government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury.'"  *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (quoting *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011)).

A "claim" encompasses "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is presented to an officer, employee, or agent of the United States," or that "is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest," so long as "the United States Government . . . provides or has provided any portion of the money or property requested or demanded; or . . . will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A).

A plaintiff may demonstrate that a claim was false or fraudulent by showing either "factual falsity" or "legal falsity." *United States ex rel. Daugherty v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 424 (S.D.N.Y. 2018).  Factual falsity involves an "incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.*  Legal falsity involves a claim that is "predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term."  *Id.*  "Within the category of legally false claims are two types of claims: (1) a claim for payment that is legally false based on an implied false certification and (2) a claim for payment that is legally false based on an express false certification."  *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 405 F. Supp. 3d 549, 556 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).  "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *Id.* (internal quotation marks, citation and alterations

omitted).  So, for example, a matter is material "(1) if a reasonable [person] would attach importance to it in determining [a] choice of action in the transaction"; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining [a] choice of action."  *Id.* at 2002–03 (internal quotation marks, citation and alterations omitted).  "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," or simply because "the Government would have the option to decline to pay if it knew of the defendant's noncompliance."  *Id.* at 2003.  And materiality "cannot be found where noncompliance is minor or insubstantial."  *Id.*

Finally, because the FCA is an anti-fraud statute, a complaint alleging FCA violations must comply with Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  *See Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995).  To survive Rule 9(b)'s heightened pleading requirements, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *United States ex rel. Kolchinsky v. Moody's Corp.*, 238 F. Supp. 3d 550, 556–57 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).

B.  Statute of Limitations

Tower and Spectrum argue that the Government's claims are barred by the FCA's statute of limitations.  Tower Mem. at 8–11, ECF No. 55; Spectrum Mem. at 7–9, ECF No. 47.  An action under the FCA "must be brought within six years of a violation or within three years of the date by which the United States should have known about a violation."  *Kellogg Brown &*

*Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1974 (2015); 31 U.S.C.

§ 3731(b).  The six-year "limitations period of [the FCA] 'begins to run on the date the claim is

made, or, if the claim is paid, on the date of payment.'"  *United States ex rel. Kreindler &*

*Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (quoting *Blusal Meats,*

*Inc. v. United States*, 638 F. Supp. 824, 829 (S.D.N.Y. 1986), *aff'd* 817 F.2d 1007 (2d Cir.

1987)).  The three-year limitations period runs from the date that the Department of Justice knew

or reasonably should have known of the facts material to the false claim.  *See United States v.*

*Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 607–08 (S.D.N.Y. 2013) (collecting cases).

### 1.  Substantive FCA Claims

The Government commenced this action on March 6, 2019.  ECF No. 1.  The

Government alleges that it first became aware of the Queens Plaza Claims in February 2017.

Compl. ¶ 102.  The Court must accept that allegation as true.  Thus, the FCA claims arising out

of the Queens Plaza Claims are timely.  Tower and Spectrum argue that the Government must

have known about the Queens Plaza Claims before 2017, based on conversations Tower alleges

its representatives had with Government officials in 2013 and subpoenas it received in 2015.

Tower Mem. at 11; Spectrum Mem. at 8.  But, in deciding a motion to dismiss, the Court may

not consider factual assertions that are not grounded in the complaint.

The Government alleges that the Brooklyn Bridge Claims were submitted in 2013, 2014,

and 2015.  Compl. ¶¶ 94–95.  Because the Government filed its complaint on March 16, 2019, its

FCA claims arising out of the Brooklyn Bridge Claims that were submitted or paid after March

16, 2013 are timely.  The Government does not argue that it should be permitted to pursue claims

submitted or paid before that date.  *See* Gov't Opp. at 30–31, ECF No. 59.  Tower argues that the

claims arising out of the Brooklyn Bridge Claims are not timely because the involvement of

Spectrum personnel in the Brooklyn Bridge project ended in 2012.  Tower Mem. at 10.  But the FCA limitations period begins to run on the date that a false claim is submitted or paid, not on the date of the conduct that the claim describes (or misdescribes).  Similarly, Spectrum argues that the last payment it received from Tower related to the Brooklyn Bridge project was on April 13, 2012.  Spectrum Mem. at 8.  But again, the limitations period runs from NYCDOT's receipt or payment dates of the Brooklyn Bridge Claims.  The date on which Spectrum last received funds is not relevant.

### 2.  Conspiracy Claims

The Government's conspiracy claim is also timely as to the Queens Plaza Claims.  Just as with the underlying FCA claims, the Government's avowed lack of knowledge regarding the submission of the Queens Plaza Claims, or agreement to submit such claims, until 2017 means that the conspiracy allegations related to those claims falls within the limitations period.

The Government's conspiracy claim is not timely, however, with respect to the Brooklyn Bridge Claims.  The Government does not allege that it first became aware of a conspiracy to submit the Brooklyn Bridge Claims in 2016 or later.  It argues only that its conspiracy claim is timely in relation to the Brooklyn Bridge Claims because acts in furtherance of the conspiracy— the submission of the Brooklyn Bridge Claims—occurred within the limitations period.  Gov't Opp. at 32–33.  Drawing on cases from districts beyond the Second Circuit, the Government argues that it should be permitted to rely on those acts to prove the existence of a conspiracy, even if the formation of the conspiracy occurred outside the limitations period.  *Id.*

In a typical civil conspiracy claim, "[t]he damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts," and "[t]he charge of conspiracy . . . is merely the string whereby the plaintiff seeks to tie

together those who, acting in concert, may be held responsible in damages for any overt act or acts." *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir. 1956). But conspiracy to violate the FCA is an independent cause of action, which provides for its own damages. 31 U.S.C. 3729(a)(1)(C) ("[A]ny person who . . . conspires to commit a violation of [the FCA] . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . ."); *see, e.g.*, *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 443 (E.D.N.Y. 1995) ("Under 31 U.S.C. § 3729(a), civil penalties are to be imposed for each false or fraudulent claim that [defendants] caused to be presented, for each false statement or record used to get a false or fraudulent claim paid *and for each conspiracy to defraud*." (emphasis added)); *United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94 Civ. 2063, 2000 WL 1336487, at *6 (D. Conn. Aug. 24, 2000) ("[B]y adding subsection [3729(a)(1)(C)], the FCA made conspiracies to defraud the government actionable.").

Because the actionable wrong in the context of an FCA conspiracy claim is the formation of the conspiracy, the statute of limitations commences to run on the date on which the conspiracy is entered into. The formation of the conspiracy is "the violation of section 3729" from which the FCA's six-year limitations period must be calculated. 31 U.S.C. § 3731(b)(1). Allowing a plaintiff to pursue an FCA conspiracy that it was aware for more than three years before commencing an action, and that was formed more than six years prior to the filing of a complaint, on the basis of conduct that does fall within the limitations period would be tantamount to the "last overt act" rule that applies to criminal conspiracies. *See, e.g.*, *United States v. Lebedev*, 932 F.3d 40, 51 (2d Cir. 2019) ("[A]bsent withdrawal, a conspirator's participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."). But the Court agrees with the holding in *Blusal Meats, Inc. v. United States* that

the last overt act rule does not apply to civil conspiracy claims under the FCA.  638 F. Supp. at

829–30, *aff'd sub nom. United States v. Blusal Meats, Inc.*, 817 F.2d 1007 (2d Cir. 1987).

Accordingly, Tower's and Spectrum's motions to dismiss the Government's FCA claims

as time barred are GRANTED as to the Government's FCA conspiracy claim related to the

Brooklyn Bridge Claims, and otherwise DENIED.

### C.  Particularity

Tower and Spectrum argue that the Government fails to plead its fraud allegations with

the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.  Tower Mem. at

12; Spectrum Mem. at 10–14.  The Court disagrees.  As required, the complaint "(1) specif[ies]

the statements that the plaintiff contends were fraudulent, (2) identif[ies] the speaker, (3) state[s]

where and when the statements were made, and (4) explain[s] why the statements were

fraudulent." *Kolchinsky*, 238 F. Supp. 3d at 556–57 (internal quotation marks and citation

omitted).

The complaint names several specific false statements, and identifies the documents in

which they were made, the party who prepared them, and the time and place they were made

with sufficient specificity.[1]  In relation to the Brooklyn Bridge project, Government has

identified (1) communications from Ahern to Skanska representing Spectrum's project manager

and superintendent as Tower employees, even though Ahern, Spectrum, and Tower knew they

were Spectrum employees, (2) specific false representations made by Spectrum's project

manager and superintendent to NYCDOT inspectors, and (3) false representations on security

identification cards and vests used by Spectrum's project manager, superintendent, and safety

---

[1] The complaint does not identify by name the employees of Ahern, Tower, or Spectrum who prepared the relevant statements, but by identifying the precise documents in or occasions on which the statements were made, it plainly provides "fair notice of [the] plaintiff's claim." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (internal quotation marks and citation omitted).

officer.  Compl. ¶¶ 80, 82, 85, 86, 87–88.  The complaint also singles out as fraudulent the DBE utilization worksheet completed by Tower and Ahern in December 2010, *id.* ¶¶ 36, 90, and the 36 Contractor Reports submitted by Tower and Ahern to Skanska from August 2010 until July 2015, *id.* ¶ 91, 93.  With respect to the Queens Plaza project, the Government identifies a list of Tower employees that included Spectrum's project manager as "Director" of Tower, and several contractor access forms submitted to the MTA listed Spectrum's project manager and superintendent as Tower superintendents.  *Id.* ¶ 81.  And the Government points to 20 monthly DBE progress reports submitted to the MTA by Ahern from February 2011 until April 2012, *id.* ¶¶ 96, 98, and the six Queens Plaza Claims, which consisted of invoices signed by Ahern representatives in August 2011, October 2011, December 2011, January 2012, March 2012, and May 2012, requesting funding for work purportedly supervised and performed solely by Tower on the Queens Plaza project, *id.* ¶ 99.

Moreover, the complaint explains with particularity why those statements were false or fraudulent.  It identifies the specific documents in which the Tower and Spectrum agreed that Spectrum would handle significant portions of the work on the Brooklyn Bridge and Queens Plaza projects, *id.* ¶ 76, and the means by which Spectrum's role was disguised, *id.* ¶ 64.  It describes in detail the work that Spectrum performed on the two projects.  *Id.* ¶¶ 68–69.

And the complaint includes facts that "give rise to a strong inference of fraudulent intent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Plaintiffs may establish fraudulent intent "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*  The Government here does both.  It is alleged that Tower agreed to perform steel painting work that it did not have the expertise or

resources to perform, and that Tower was an attractive choice for that work because it was a

DBE.  Compl. ¶ 51.  Tower, therefore, turned to Spectrum to provide the experience and

resources.  *Id.* ¶¶ 52–54, 59.  Because Spectrum was not a DBE, the parties had a strong motive

to cover up Spectrum's involvement.  And as discussed, the complaint alleges in detail the

mechanisms by which that scheme was executed.  In addition, the complaint's allegations tend to

show that Tower and Spectrum were conscious of their wrongdoing.  It alleges that they took

significant steps to hide Spectrum's participation in the project, including by using misleading

uniforms and security cards, and lying when questioned by NYCDOT investigators.  *Id.* ¶¶ 80–

88; *see S.E.C. v. Musella*, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir.

1990) ("This false exculpatory statement evidences consciousness of guilt and has independent

probative value of *scienter*."); *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14 Civ. 9792, 2015

WL 7871037, at *4 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016)

("Consciousness of guilt . . . could be used to establish the [defendants'] intent to defraud.").

Spectrum argues that the Government's allegations fail to specifically identify

Spectrum's role in the fraud.  Spectrum Mem. at 12–14.  But the complaint includes clear factual

allegations indicating that Spectrum was a knowing participant in the fraudulent scheme,

including the written agreement between Tower and Spectrum that Spectrum, Compl. ¶ 75,

Spectrum's superintendent's statements that "Spectrum didn't exist on the job" and "everything

was run through Tower," *id.* ¶ 70, Spectrum employees' explicit understanding that if anyone

asked, they should say they worked for Tower, *id.* ¶ 82, the assignment of a Tower email address

and Tower business cards to Spectrum's superintendent, *id.*, and Spectrum's project manager's

and superintendent's explicit false statements to NYCDOT investigators and to other contractors,

*id.* ¶¶ 85–86.

Accordingly, Tower's and Spectrum's motions to dismiss on the ground that the complaint fails to satisfy the requirements of Rule 9(b) are DENIED.

### D.  Submission of Claims

Tower argues that the Government fails to allege facts showing that it submitted any claims containing falsehoods, and that at most the Government has shown false statements in certain certification forms that are not themselves requests for payment.  Tower Mem. at 28.  On both the Brooklyn Bridge and Queens Plaza projects, claims for payment were submitted to a recipient of federal money.  *See* 31 U.S.C. § 3729(b)(2)(A).  On the Brooklyn Bridge project, Skanska submitted to the NYCDOT the 36 Brooklyn Bridge Claims, requesting funding for, among other things, work purportedly supervised and performed solely by Tower.  Compl. ¶ 94.  On the Queens Plaza project, Ahern submitted to the MTA the six Queens Plaza Claims, requesting funding for work purportedly supervised and performed solely by Tower.  Compl. ¶ 99.  It is not disputed that those projects were funded by the USDOT, that the money was being used to advance a federal program or interest, or that the USDOT provided some portion of the money or property requested or demanded.

"[T]o 'cause' [a] false claim to be submitted, it must be the 'natural, ordinary and reasonable consequence of one's conduct.'"  *United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 195 (S.D.N.Y. 2016) (quoting *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 671–72 (2008)) (alterations omitted).  The Government alleges specific steps that Tower took to circumvent the DBE Regulations and hide the extent of Spectrum's involvement, including by making misrepresentations in required forms.  Compl. ¶¶ 36, 90–99.  Accepting those allegations as true, it is clear that Tower caused the claims

submitted by Ahern and Skanska to include false statements suggesting that the DBE requirements were met as a result of Tower's work.

Spectrum argues that the Government has failed to show that it participated in the submission of the allegedly false claims, because the complaint does not allege that Spectrum prepared any of the false documents.  Spectrum Mem. at 14–16.  But the complaint alleges that Spectrum and Tower agreed to hide Spectrum's work on the project, and that Spectrum employees were intimately involved in the process of covering up Spectrum's role.  Compl. ¶¶ 59, 64, 76, 80–82, 85, 86, 87–88.  The goal of these actions was to fool Skanska, the NYCDOT, and the MTA into believing that the DBE requirements were being met on the Brooklyn Bridge and Queens Plaza projects.  It was entirely predictable—indeed, integral to the scheme—that as a result of the deception, claims for payment would be submitted that contained falsehoods.

Accordingly, Tower's and Spectrum's motions to dismiss on the grounds that the complaint fails to adequately allege their participation in the submission of false claims are DENIED.

E.  Falsity

Tower argues that the Government has failed to allege facts showing that the relevant claims contained false or fraudulent statements.  Tower Mem. at 12–15, 26–28.  Obviously, however, the Brooklyn Bridge and Queens Plaza Claims contained incorrect descriptions of goods or services provided, and so were factually false.  *Daugherty*, 342 F. Supp. 3d at 424.  Each of the 36 Brooklyn Bridge Claims included the Contractor Reports executed by Tower and Ahern, which represented that Tower solely performed and supervised the work on the Brooklyn Bridge project for which Tower was paid.  Compl. ¶¶ 91, 94–95.  Likewise, the Queens Plaza

Claims included monthly DBE progress reports executed by Ahern, which represented that Tower did not subcontract any portion of its work to a non-DBE. *Id.* ¶¶ 96, 99. As alleged in the complaint, Tower in fact subcontracted with Spectrum, a non-DBE, to perform and supervise the work on both projects. *Id.* ¶¶ 59, 68–69, 76.

Both the Brooklyn Bridge and Queens Plaza Claims were also legally false, because they impliedly certified compliance with the DBE Regulations and the provisions of the Brooklyn Bridge and Queens Plaza contracts that required work to be performed by DBEs. The DBE Regulations provide that work performed by a DBE may be counted towards a project's DBE goal only if the DBE is "performing a commercially useful function on that contract," meaning that the DBE "is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved," and does not have a "role [that] is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation." 49 C.F.R. § 26.55(c). And both projects' contract terms were explicit. The Brooklyn Bridge contract required that a DBE "carr[y] out its responsibilities by actually performing, managing, and supervising the work involved," and that "[a]ll work performed by [the DBE] must be controlled and supervised by the [DBE]," Compl. ¶ 27. The Queens Plaza contract provided that a DBE must "actually perform[], manag[e], and supervis[e] the work involved." *Id*. ¶ 41.

"[I]mplied certification theory can be a basis for liability . . . where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001. Both conditions are

met here.  The Brooklyn Bridge and Queens Plaza Claims included a number of specific

representations about the services Tower provided, including that Tower solely performed and

supervised the work on the Brooklyn Bridge project, Compl. ¶¶ 91, 94–95, and that Tower did

not subcontract any portion of its work to a non-DBE, *id.* ¶¶ 96, 99.  Those representations were,

at best, rendered misleading half-truths by the failure to mention Spectrum's extensive work on

the projects, which violated the DBE Regulations and the contracts' requirements.[2]

Tower argues that its actions did comply with the DBE Regulations, because those

regulations allow a contract to be awarded to a bidder who makes "good faith efforts" to meet

DBE goals, which include "[m]aking efforts to assist interested DBEs in obtaining bonding, lines

of credit, or insurance as required by the recipient or contractor," and "[m]aking efforts to assist

interested DBEs in obtaining necessary equipment, supplies, materials, or related assistance or

services." 49 C.F.R. Pt. 26, App. A; *see* Tower Mem. at 14–15.  The DBE Regulations also

provide that a recipient of funds "cannot be penalized, or treated . . . as being in noncompliance

with this rule, because . . . DBE participation falls short of your overall goal, unless you have

failed to administer your program in good faith." 49 C.F.R. § 26.47(a); Tower Mem. at 15.  But

those regulations are irrelevant to the question of whether the representations in the Brooklyn

Bridge and Queens Plaza Claims were false.  Spectrum was not brought in by a contract bidder

in an effort to assist Tower in obtaining necessary equipment, supplies, materials.  Instead,

Spectrum took over much of the work that Tower had agreed to perform.  Compl. ¶¶ 59, 68–69,

76.  Moreover, Spectrum's involvement was not part of a good faith effort to meet the projects'

DBE goals.  To the contrary, it was an effort to circumvent those goals, as evidenced by the

---

[2] Tower's argument that the Government seeks to collaterally attack its status as a DBE misunderstands the
complaint's allegations.  Tower Mem. at 15–17. The Government's contention is not that Tower falsely represented
itself as a DBE, but that Tower falsely represented that it was managing and supervising work on the Brooklyn
Bridge and Queens Plaza projects.

considerable measures Spectrum and Tower took to hide Spectrum's involvement.  *Id.* ¶ 80, 82, 85–88.

Tower also points to a provision of the Brooklyn Bridge contract that states, "All work performed by the [DBE] must be controlled and supervised by the [DBE] without duplication of supervisory personnel from the [c]ontractor, other [s]ubcontractors on the contract, or their affiliates."  Tower Mem. at 19.  Tower argues that this provision indicates that only involvement by the project's main contractor or subcontractors is prohibited.  Even if Tower's interpretation were correct, it would not cure the factual falsehoods in the Brooklyn Bridge Claims, or the implied legal falsehoods related to compliance with the DBE Regulations—and, of course, it would have no bearing on the Queens Plaza Claims.  In any event, that provision standing alone cannot be read to authorize Spectrum's participation in the Brooklyn Bridge project merely because it enumerates certain actors who must be excluded, especially in light of the contract's requirement that DBEs perform a "commercially useful function."  Compl. ¶ 27.

Tower also argues that Spectrum's involvement in the project was not as extensive as the Government represents.  Tower Mem. at 19–20.  But on a motion to dismiss, the Court must accept the Government's allegations as true.

Accordingly, Tower's motion to dismiss on the ground that the Brooklyn Bridge and Queens Plaza Claims did not contain false or fraudulent representations is DENIED.

   F.   Materiality

Tower and Spectrum argue that falsehoods concerning Spectrum's involvement in the Brooklyn Bridge and Queens Plaza projects are not material misrepresentations.  Tower Mem. at 20–26; Spectrum Mem. at 19–22.  But the complaint's allegations establish that compliance with the DBE Regulations and the DBE provisions of the projects' contracts were material to the

NYCDOT and the MTA's payment decisions, because a reasonable party in the position of those agencies would consider DBE compliance important in making payments, and because Tower and Spectrum were on actual notice of the importance the agencies placed on the DBE goals. *See Escobar*, 136 S. Ct. at 2002–03.

The Government alleges that if the NYCDOT and the MTA had become aware of Spectrum's involvement, they would have referred the matter to law enforcement and stopped payment. Compl. ¶¶ 104–05. That statement is supported by a number of specific factual allegations. Compliance with the DBE Regulations would have been important to both the NYCDOT and the MTA because establishing DBE goals and enforcing the DBE Regulations was a condition of the USDOT funding provided to those agencies. *Id.* ¶ 18. The federal government has made good on that requirement, repeatedly suspending or debarring contractors and their owners based on their involvement in schemes to defraud the DBE program, and actively pursuing the recovery of contract payments for USDOT funded projects that were subject to DBE fraud through civil and criminal actions, including in a prior action against Ahern. *Id.* ¶¶ 107–09.

Unsurprisingly, the NYCDOT and the MTA incorporated the DBE Regulations into the projects' contracts. *Id.* ¶¶ 27, 40–41. And they took steps to ensure the DBE Regulations were being followed. The Brooklyn Bridge contract required contractors to report payments made to all subcontractors and all DBEs, *id.* ¶ 28, stated that contractors could not unilaterally modify their relationships with without first providing written justification with a substantive basis for the change and obtaining approval from the NYCDOT, *id.* ¶ 29, and provided that if a contractor failed to comply with the DBE requirements, the NYCDOT could cancel, terminate, or suspend the contract, *id.* ¶ 30. Moreover, the NYCDOT retained a third-party firm with expertise in

construction management to be stationed on-site to monitor compliance with the DBE

Regulations on the Brooklyn Bridge project.  *Id.* ¶ 31.  And, of course, each of the Brooklyn

Bridge Claims was required to include reporting on Tower's work as a DBE.  *Id.* ¶¶ 91, 94–95.

Similarly, the Queens Plaza contract required contractors and sub-contractors to submit a

schedule of DBE participation as well as monthly DBE progress reports, and provided that

failure to carry out the DBE requirements constituted a material breach.  *Id.* ¶ 41.  In awarding

the contract to Ahern, the MTA reiterated that Ahern was required to submit monthly reports on

their progress towards meeting the DBE goals.  *Id.* ¶ 42.  And again, the Queens Plaza Claims

included copies of those monthly DBE progress reports, which represented that Tower did not

subcontract any portion of its work to a non-DBE.  *Id.* ¶¶ 96, 99.

All of these measures reflect the importance of the DBE goals to the NYCDOT and the

MTA.  They also must have put Tower and Spectrum on notice that the agencies considered

compliance with the DBE Regulations important. Tower and Spectrum's actual knowledge of the

importance of the DBE rules is further demonstrated by their extensive efforts to cover up

Spectrum's role on the projects.  *Id.* ¶¶ 80–87; *see United States ex rel. Janssen v. Lawrence

Mem'l Hosp.,* 949 F.3d 533, 544 (10th Cir. 2020) ("[E]vidence of a cover-up . . . might signal

materiality."); *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (holding

that materiality of a condition could be inferred from a defendant's "own actions in covering up

the noncompliance").

Tower argues that the Brooklyn Bridge contract delineates certain actions as "material

breaches" or conditions of payment, but does not list failure to comply with the DBE

requirements as one of them.  Tower Mem. at 22–23.  The Supreme Court has held, however,

that "when evaluating materiality under the [FCA], the Government's decision to expressly

identify a provision as a condition of payment is relevant, but not automatically dispositive."
*Escobar*, 136 S. Ct. at 2003.  Here, the Government's allegations support the inference that, had
the NYCDOT discovered that Tower was not performing much of the work it claimed on the
Brooklyn Bridge project, that would have affected its decision to continue payment, regardless of
whether the contract expressly stated as much.

Tower and Spectrum also argue that the DBE goals on the Brooklyn Bridge and Queens
Plaza projects were merely "aspirational," and, therefore, that false certifications of compliance
with the rules for meeting those goals cannot be material.  Tower Mem. at 23–24; Spectrum
Mem. at 21–22.[3]  This argument is inconsistent with the subterfuge Tower and Spectrum
allegedly undertook to make it appear that Tower was complying with the DBE Regulations and
helping to meet the projects' DBE requirements.  Compl. ¶¶ 80–87.  Certainly, it appears Tower
and Spectrum believed that Tower's work being counted towards the DBE goals was important
to their getting paid.  And reasonably so.  The NYCDOT and the MTA may not have been
required to ultimately hit their DBE targets on the Brooklyn Bridge and Queens Plaza projects,
but they were required to make good faith efforts to do so, and to enforce the DBE Regulations
to that end.  Obviously, those agencies could have been expected to strongly consider stopping
payment upon discovering that a DBE subcontractor whose work they intended to be counted
towards their DBE goals was, in fact, not performing a commercially useful function.

Finally, Tower argues that the Government was aware of Spectrum's involvement in the
Brooklyn Bridge and Queens Plaza projects as early as 2013 because of the investigation that led

[3] Spectrum's argument relies largely on the assertion that Tower's work was ultimately not put forward by Skanska
as progress towards the DBE goals on the Brooklyn Bridge project.  Spectrum Mem. at 22.  The Court may not
consider this factual allegation, which appears nowhere in the complaint, in deciding Spectrum's motion to dismiss.
In any event, the fact that Skanska did not include Tower's work in its effort to show it had met the DBE goals in
2018 (just a few months before this suit was commenced) is not relevant to the question of whether
misrepresentations regarding Tower's work were material to payment decisions made in 2013, 2014, and 2015.

26

to this case, and, as a consequence, the fact that the Brooklyn Bridge and Queens Plaza Claims continued to be paid out indicates that any non-compliance was not material.  Tower Mem. at 25–26.  There are no facts in the complaint that support Tower's contention that the Government was aware of the alleged scheme at the time that the claims were paid, much less that the NYCDOT or the MTA were aware.  Regardless, it is hard to fathom how an aggressive Government investigation into Tower and Spectrum's alleged wrongdoing with respect to DBE goals could be used to show that false statements related those goals were immaterial.

Accordingly, Tower's and Spectrum's motions to dismiss on the ground that the Government has failed to allege material misrepresentations are DENIED.

### G.  Damages

Tower and Spectrum argue that the complaint fails to allege that the Government suffered damages as a result of the alleged false statements, and that injury to the Government is a required element of an FCA claim.  Tower Mem. at 29–30; Spectrum Mem. at 22.  It is an open question in the Second Circuit whether an FCA plaintiff must show that the Government suffered actual damages.  *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 872 n.5 (S.D.N.Y. 2015) ("[The defendant] asserts that proving damages is an essential element of an FCA claim, but acknowledges that the U.S. Court of Appeals for the Second Circuit has never ruled on this issue and most other circuits have held that damages are *not* an element of an FCA claim.").

The Court agrees with those courts that have found that an FCA plaintiff need not show actual damages to the Government, so long as there is "some direct impact on the [f]ederal [t]reasury."  *Unites States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 328 (S.D.N.Y. 2004); *see, e.g., United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester*

*Cty., N.Y.*, 668 F. Supp. 2d 548, 568 (S.D.N.Y. 2009) ("[T]he most faithful interpretation of the statutory language is a conclusion that damages to the United States need not be shown in order to establish FCA liability."); *United States ex rel. Feldman v. Van Gorp*, 674 F. Supp. 2d 475, 482 (S.D.N.Y. 2009) ("[T]he most reasonable interpretation of the statutory language is that damages to the United States are not a required element of an FCA claim.").

The FCA provides that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . *is liable* to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . *plus* 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(A) (emphasis added).  That language indicates that the Government's actual damages are relevant to the amount of recovery, not the issue of liability.  The Government is entitled to set conditions on payment of its funds to advance policy goals— including the goal of increasing the participation of historically disadvantaged businesses in the construction industry—and to insist that those conditions are met.  It would be inconsistent with that principle, and the FCA's language, to limit FCA actions to cases in which the Government suffered a dollars-and-cents loss as a result of the false claims.

Indeed, the Second Circuit has held that the Government can recover even where false claims were made to secure a grant that was allocated for the benefit of third parties, and "the government received nothing of tangible value from the defendant," because "when a third-party successfully uses a false claim regarding how a grant will be used in order to obtain the grant, the government has entirely lost its opportunity to award the grant money to a recipient who would have used the money as the government intended."  *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 88 (2d Cir. 2012).  The situation in this case is analogous.  The DBE Regulations

exist not for the Government's pecuniary benefit, but to "ensure nondiscrimination in the award and administration of [USDOT]-assisted contracts," "create a level playing field on which DBEs can compete fairly for [USDOT]-assisted contracts," "help remove barriers to the participation of DBEs in [USDOT]-assisted contracts," and "assist the development of firms that can compete successfully in the marketplace outside the DBE program." 49 C.F.R. § 26.1.  The scheme in this action frustrated the Government's ability to pursue those aims, and diverted Government funds that might have gone to contractors whose participation in the Brooklyn Bridge and Queens Plaza projects would have advanced the DBE Regulations' purposes.

Accordingly, Tower's and Spectrum's motions to dismiss on the ground that the Government has failed to allege actual damages are DENIED.

### H.   False Records or Statements

Spectrum argues that the Government's allegations fail to establish that it made or used false records or statements material to a false or fraudulent claims, or caused such records or statements to be made or used, in violation of 31 U.S.C. § 3729(a)(1)(B); *see* Spectrum Mem. at 16–17; Compl. ¶¶ 116–119.   To pursue a violation of the FCA's false records or statements provision, a plaintiff "must allege that: (1) [the defendant] made, or caused [another party] to make, a false or fraudulent record or statement (2) [the defendant] knew it to be false or fraudulent, and (3) it was material to a claim." *United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010).  Spectrum contends that the Government has failed to attribute to it any false statements.

This is incorrect.  The Government alleges that, during its participation in the scheme, Spectrum employees made a number of knowingly false statements, representing at project meetings and to NYDCOT inspectors that they were Tower employees.  Compl. ¶¶ 85–86.  More

to the point, Spectrum's alleged participation in the scheme caused numerous false records to be generated, including the DBE utilization worksheet completed by Tower and Ahern in December 2010 for the Brooklyn Bridge project, *id.* ¶¶ 36, 90, 36 Contractor Reports submitted by Tower and Ahern to Skanska from August 2010 through July 2015 on the Brooklyn Bridge project, *id.* ¶ 91, 93, the list of Tower employees identifying Spectrum's project manager as "Director" of Tower and several contractor access forms submitted to the MTA listing Spectrum's project manager and Spectrum's superintendent as Tower superintendents on the Queens Plaza project, *id.* ¶ 81, and the 20 monthly DBE progress reports submitted to the MTA by Ahern from February 2011 until April 2012 on the Queens Plaza project, *id.* ¶¶ 96, 98.

Accordingly, Spectrum's motion to dismiss the Government's claim under 31 U.S.C. § 3729(a)(1)(B) is DENIED.

> I.   Conspiracy

Spectrum also argues that the Government's allegations fail to show that it conspired to violate the FCA under 31 U.S.C. § 3729(a)(1)(C).  Spectrum Mem. at 17–19.  The elements of an FCA conspiracy claim are: "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States and (2) one or more conspirators performed any act to effect the object of the conspiracy."  *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 705 (S.D.N.Y.) (internal quotation marks and citation omitted).

Because the Court has determined that the conspiracy cause of action is time barred with respect to the Brooklyn Bridge Claims, consideration of the sufficiency of the Government's conspiracy claim is limited to the Queens Plaza Claims.  The complaint alleges that at the time Ahern and Tower submitted their bid to the MTA for the Queens Plaza contract, Ahern,

Spectrum, and Tower had already agreed that Spectrum would provide management, supervision, equipment, and financial resources for the Queens Plaza job and Tower would merely pay for the laborers who would follow Spectrum's direction.  Compl. ¶ 61.  The bid represented that Ahern could meet a 17% DBE goal based on Tower's work.  *Id.*  Meeting that goal, however, required submitting false claims indicating that Tower was supervising and performing the work without the level of assistance Spectrum was providing.  *See id.* ¶ 69 ("Spectrum's [s]uperintendent also worked on the Queens Plaza project, managing project schedules, evaluating and selecting vendors, and assigning and supervising work on the project.").  The Government alleges that Ahern understood that Spectrum was playing a large role in the projects, and that its role should be disguised.  *Id.* ¶ 72.  Thus, Ahern submitted contractor access forms listing Spectrum's Project Manager and Spectrum's Superintendent as Tower superintendents on the Queens Plaza project.  *Id.* ¶ 81.  These allegations make out an actionable conspiracy to include false statements in the Queens Plaza Claims.

Accordingly, Spectrum's motion to dismiss the Government's conspiracy claim under 31 U.S.C. § 3729(a)(1)(C) is DENIED as to the Queens Plaza Claims.

IV.   Common Law Claims

The Government also asserts two common law claims for (1) unjust enrichment, Compl. ¶¶ 125–126, and (2) payment under mistake of fact, *id.* ¶¶ 127–131.

A.  Unjust Enrichment

Tower and Spectrum argue that the Government has failed to satisfy the elements of unjust enrichment under New York Law.  Tower Mem. at 30; Spectrum Mem. at 23–24.

To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and

31

good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder,* 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks and citation omitted). "While a plaintiff need not demonstrate that he is in privity with the defendant, a plaintiff still must show that there is a 'sufficiently close relationship' with the defendant that 'could have caused reliance or inducement by the plaintiff.'" *In re N. Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 315 (S.D.N.Y. 2017) (quoting *Georgia Malone*, 973 N.E.2d at 746–47), *aff'd sub nom. Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019), and *aff'd sub nom. Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4 (2d Cir. 2019).

The complaint's allegations do not establish that Tower or Spectrum had a relationship with the Government that could have caused reliance or inducement. The false claims that Tower and Spectrum allegedly caused to be submitted led to the NYCDOT and the MTA paying funds, not the Government. *See* Compl. ¶¶ 94–95, 98–99, 104–105. To be sure, the USDOT provided those funds to the NYCDOT and the MTA, and those funds were to be used to advance USDOT interests. *Id.* ¶¶ 2–3. But the complaint does not allege that the federal government, as such, took any action based on the claims that Tower and Spectrum caused to be submitted.

Accordingly, Tower's and Spectrum's motions to dismiss the Government's unjust enrichment claim are GRANTED.

### B. Mistake of Fact

Tower and Spectrum also move to dismiss the Government's claim for payment under mistake of fact. Tower Mem. at 30–31; Spectrum Mem. at 24–25.

New York recognizes a claim for payment of funds under a mistake of fact, sometimes referred to as an "action[] for money had and received." *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 708 (App. Div. 1990). "The elements of money had and received are similar

to the elements of unjust enrichment: '(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money.'" *Cohen v. BMW Investments L.P.*, 144 F. Supp. 3d 492, 501 (S.D.N.Y. 2015) (quoting *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir. 1987)), *aff'd,* 668 F. App'x 373 (2d Cir. 2016). "The heightened pleading standard of Rule 9(b) applies to state common law claims where those claims are premised on a defendant's underlying fraudulent conduct, including the submission of fraudulent claims to government programs." *United States ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 269 (S.D.N.Y. 2014)

The complaint does not allege with particularity that Tower or Spectrum received funds as a result of a mistake of fact on the part of the NYCDOT or the MTA.  Spectrum Mem. at 24–25.  To be sure, it alleges in great detail the particular false claims that were submitted to those agencies, and the scheme that led to the mistaken belief that Tower was complying with the DBE requirements on the Brooklyn Bridge and Queens Plaza projects.  But it does not identify specific payments to Tower or Spectrum that resulted from that false belief, or show that any payments to Tower or Spectrum consisted of federal funds in which the Government has a property interest.[4]

Accordingly, Tower's and Spectrum's motions to dismiss the Government's claim for payment under a mistake of fact are GRANTED.

---

[4] To be clear, the Court does not hold that the Government has failed to allege that the NYCDOT or the MTA made payments based on the claims that Tower and Spectrum submitted, only that the complaint's allegations do not identify specific payments of funds *to Tower and Spectrum* (i.e. specific monies had and received) that were based on a mistake of fact.

**CONCLUSION**

For the foregoing reasons, Tower's and Spectrum's motions to dismiss are GRANTED in part and DENIED in part.  The Government's claim for an FCA conspiracy related to the Brooklyn Bridge Claims is dismissed as time barred.  The Government's claims for unjust enrichment and payment under mistake of fact are also dismissed.

It is ORDERED that by **September 8, 2020**, the Government shall submit a letter indicating whether it intends to seek leave to file an amended complaint.

Ahern's motion to amend the caption is GRANTED.  The Clerk of Court is directed to amend the caption as styled above.

The Clerk of Court is directed to terminate the motions at ECF Nos. 46, 49, 51, and 54

SO ORDERED.

Dated:  August 25, 2020
     New York, New York

ANALISA TORRES
United States District Judge